**William SUSSLE, Plaintiff,**

v.

**SIRINA PROTECTION SYSTEMS CORP., and Sirina Fire Protection Corp., Defendants.**

**No. 01 Civ.3787 WK.**

United States District Court, S.D. New York.

June 10, 2003.

---

Daniel J. Kaiser, Kaiser Saurborn & Mair, P.C., New York, NY, for Plaintiff.

Saul D. Zabell, Frank & Breslow, P.C., Farmingdale, NY, for Defendants.

### OPINION AND ORDER

KNAPP, Senior District Judge.

Plaintiff William Sussle ("Plaintiff") brings this action against his former employers, Defendants Sirina Protection Systems Corp. ("Sirina Protection Systems") and Sirina Fire Protection Corp. ("Sirina Fire Protection") (collectively the "Defendants"), alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107. He contends that the Defendants unlawfully discriminated against him on the basis of his disability when they failed to provide him with reasonable accommodations and thereafter terminated his employment. He also contends that the Defendants unlawfully retaliated against him when he asked for reasonable accommodations. The Defendants now move for summary judgment. For the reasons that follow, we GRANT their motion for summary judgment.

### BACKGROUND

**I. The Plaintiff's Medical History Prior To His Employment With The Defendants**

The following facts are undisputed unless otherwise stated. Sometime between 1994 and 1997, the Plaintiff began feeling tired. (*See* 7/10/02 Deposition of William Sussle ("Sussle Depo.") 33:25, 34:2–14.) His symptoms of fatigue led him to consult with Dr. Frank Karpowicz ("Dr.Karpow-

icz"). (*See* Sussle Depo. 34:15–18; *see also* Declaration of Saul D. Zabell ("Zabell Decl."), Ex. G.). Dr. Karpowicz diagnosed the Plaintiff with Hepatitis C. (*See* Sussle Depo. 113:14–18; *see also* Zabell Decl., Ex. G.)

Although the Plaintiff does not remember the exact date on which he learned of that diagnosis, he acknowledges that he had been informed of the diagnosis by 1997. (*See* Pl.'s Opp'n Statement Pursuant to Local Rule 56.1 ("Pl.'s Opp'n Statement") ¶ 56; Defs.' Statement Pursuant to Local Rule 56.1 ("Defs.' Statement") ¶ 56.) In other words, he knew that he suffered from Hepatitis C before he began to work for the Defendants. (*See* Sussle Depo. 100:8–16.)

## II. The Plaintiff And Sirina Fire Protection

Defendant Sirina Fire Protection is a private business that installs automatic sprinklers, fire and detection systems, and fire suspension equipment. (Defs.' Statement ¶ 1; Pl.'s Opp'n Statement ¶ 1.) On January 6, 1998, the company hired the Plaintiff as a Sales Representative for its sprinkler division. (Defs.' Statement ¶ 2; Pl.'s Opp'n Statement ¶ 2.) As a Sales Representative, the Plaintiff was responsible for selling installation and maintenance contracts, renewing existing contracts, and generating new business leads and sales. (Defs.' Statement ¶ 3; Pl.'s Opp'n Statement ¶ 3.)

The Plaintiff and the Defendants have different views about his performance as a Sales Representative at Sirina Fire Protection. The Plaintiff attests that he successfully generated some new sales for Sirina Fire Protection and that no manager ever complained to him about his sales performance. (Declaration of William Sussle ("Sussle Decl.") ¶ 3.) The Defendants, however, contend that the Plaintiff failed to close a single deal or to sign a single new contract for Sirina Fire Protection. (Defs.' Statement ¶ 4.)

## III. The Plaintiff And Sirina Protection Systems

Anthony Florez, the president and owner of Sirina Fire Protection, also owns several other companies, including Defendant Sirina Protection Systems. (*See* Deposition of Anthony Florez ("Florez Depo."), annexed as Exhibit A to the Declaration of Daniel J. Kaiser ("Kaiser Decl."), 5:12–25, 6:2–9, 7:20–25, 8:2–25, 9:2.) Sirina Protection Systems is involved in the business of fire alarms. (Florez Depo. 13:2–4.)

Sirina Fire Protection transferred the Plaintiff to Defendant Sirina Protection Systems in September 1998. (Defs.' Statement ¶ 5; Sussle Decl. ¶ 4.) His responsibilities at the latter company were similar to the ones he previously faced at Sirina Fire Protection; as a Sales Representative for Sirina Protection Systems, the Plaintiff was responsible for selling installation and maintenance contracts, renewing existing contracts, and generating new business leads and sales. (Defs.' Statement ¶ 7; Pl.'s Opp'n Statement ¶ 7.)

According to the Defendants, Sirina Fire Protection transferred the Plaintiff to Sirina Protection Systems's fire alarm sales and maintenance division in an effort to provide him with another opportunity to be successful. (Defs.' Statement ¶ 5.) At Sirina Protection Systems, he reported to Thomas Boyle ("Boyle"), a vice-president in charge of operations. (Florez Depo. 7:18–25, 9:23–25, 27:6–16.) Boyle supposedly told the Plaintiff that his transfer to Sirina Protection Systems represented his final opportunity to improve his sales performance. (Defs.' Statement ¶ 6.)

The Plaintiff disputes much of this account. (*See* Pl.'s Opp'n Statement ¶¶ 4–6; Sussle Decl. ¶¶ 3–4.) He contends that Boyle never told him that the transfer would be his last opportunity· to improve his sales performance. (*See* Sussle Decl. ¶ 4) Rather, the Plaintiff thought that he was transferred because of his business contacts in Manhattan. (*See id.*)

The parties also disagree about the Plaintiff's work performance at Sirina Protection Systems. According to the Defendants, the Plaintiff continued to register dismal sales results while working at Sirina Protection Systems and exhibited inappropriate and objectionable behavior with potential clients. (Defs.' Statement ¶ 8.) Boyle recounts a series of incidents and reprimands, which occurred between September 1998 and June 1999, where, among other things: (a) customers and competitors complained about the Plaintiff's sales tactics, attitude, demeanor, and unprofessional behavior; (b) Boyle consistently needed to warn the Plaintiff about his interpersonal skills and the manner in which he interacted with others; and (c) Boyle reprimanded or otherwise spoke to the Plaintiff about his unacceptably low activity levels, his poor work performance, his failure to qualify customer leads in order to discover legitimate customer opportunities, his failure to prepare for a sales meeting, and his intolerable conduct (such as his effort to tape record a customer meeting). (*See* Affidavit of Thomas Boyle ("Boyle Aff.") ¶¶ 7–25.) Boyle memorialized the Plaintiff's performance problems in a series of Interoffice Memoranda which he prepared for the Plaintiff's personnel file. (*See* Zabell Decl., Ex. N.)

On June 29, 1999, Boyle met with the Plaintiff to discuss his dissatisfaction with the Plaintiff's performance. (Boyle Aff. ¶ 26; *cf.* Sussle Depo. 172:17–19, 173:2–8.) At that meeting, Boyle advised the Plaintiff that he would make a decision regarding the Plaintiff's tenure with Sirina Protection Systems by the end of July 1999. (*See* Boyle Aff. ¶ 27.) On July 20, 1999, the Plaintiff was terminated from his employment with Sirina Protection Systems. (*See* Boyle Aff. ¶ 28; *see also* Sussle Decl. ¶ 23.)

The Plaintiff disputes Boyle's account and describes a different experience altogether. He contends that Boyle's memoranda regarding his poor work performance history were not true. (Sussle Decl. ¶ 11.) For example, according to the Plaintiff, he never missed a sales meeting and was never late or took a day off. (*Id.*) To the contrary, the Plaintiff indicates that he worked "extra-late" on many occasions to complete assignments. (Sussle Decl. ¶ 12.) Moreover, the Plaintiff states that he "was very responsive to sales leads" and successfully developed leads "which led to sales while he was there and after he left." (Sussle Decl. ¶ 13.) From the Plaintiff's perspective, Boyle was often "unresponsive" to the leads he generated and this frustrated or otherwise delayed the Plaintiff's sales. (*See* Sussle Decl. ¶ 14.)

The Plaintiff also explains that none of Boyle's memoranda were shared with him. (*See* Sussle Decl. ¶ 10.) For that matter, the Plaintiff contends that he was never criticized for his interactions with clients or potential clients and that none of the alleged work concerns about him were ever discussed with him. (*See* Sussle Decl. ¶¶ 16–17.) Instead, the Plaintiff received a bonus in December 1998 and thereafter received an 8% raise. (Sussle Decl. ¶ 19.) When Sirina Protection Systems terminated the Plaintiff's employment on July 20, 1999, he was purportedly told that general business conditions led to his termination; no one supposedly advised the Plaintiff that he had been fired "for anything to do

with [his] alleged poor work performance." (Sussle Decl. ¶¶ 23–24.) Indeed, the Plaintiff contends that Florez wrote him a positive letter of recommendation after his termination. (*See* Sussle Decl. ¶¶ 25–27; *see also* Kaiser Decl., Ex. E.) [1]

Following his termination, the Plaintiff alleged that he was discharged because of his Hepatitis C. His troubles with the Defendants in this regard, especially with Boyle, apparently began in April 1999, when the Plaintiff decided to treat his Hepatitis C with medication. Over time, the Plaintiff had chosen to consult with Dr. Ira Goldman ("Dr.Goldman") in an effort to seek treatment for his illness; he had been "told that [Dr. Goldman] was a doctor who was ... on top of th[at] disease and understood a lot about it." (*See* Sussle Depo. 58:4–11, 59:11–13, 105:7–15.) Dr. Goldman informed the Plaintiff that he had the option of pursuing Interferon and Ribavirin combination therapy ("the combination therapy"). (*See* Sussle Depo. 59:24–25, 60:2–17, 103:18–25, 104:2–3, 105:7–15.) After the Plaintiff considered whether he wanted to undergo that type of treatment, Dr. Goldman initiated the combination therapy. (*See* Sussle Depo. 59:24–25, 60:2–17, 103:18–25, 104:2–15, 105:10–15.) The Plaintiff "[s]elf-administered" the therapy by ingesting Interferon pills and applying the Ribavirin liquid with a syringe. (*See* Sussle Depo. 60:18–25.)

The Plaintiff treated his Hepatitis C with the combination therapy of Interferon and Ribavirin from April 1999 until July 1999. (*See* Defs.' Statement ¶ 38; Pl.'s Statement ¶ 38; *cf.* Sussle Depo. 8:8–21.) However, the medication led him to develop anemia and made him feel tired. (*See* Sussle Depo. 63:8–23, 64:11–15, 102:18–24.) The fatigue he felt as a result of the medication allegedly affected his ability to concentrate, to walk, and to climb stairs. (*See* Sussle Depo. 62:22–25, 63:2–25, 64:2–23, 102:18–14.) The Plaintiff contends that he was unable to sustain periods of concentration, particularly when it "got hot outside," although he concedes that the treatment did not affect his concentration for most of the working day and on some days not at all. (*See* Sussle Depo. 63:17–25, 64:2–8, 66:9–25, 67:2–13.) He also purportedly could not walk long distances and had a difficult time climbing stairs. (*See* Sussle Decl. ¶ 28; Sussle Depo. 64:118, 67:9–23.)

Once Dr. Goldman initiated the combination therapy, the Plaintiff began to feel that he was not "being treated properly and ... sought a second opinion." (*See* Sussle Depo. 59:24–25, 60:2–8.) As such, he consulted with Dr. David Bernstein ("Dr.Bernstein"). (*See* Sussle Depo. 59:21–25, 60:2–8, 180:22–25, 181:2.) Thereafter, Dr. Bernstein supervised the Plaintiff's Hepatitis C treatment. (*See* Sussle Depo. 58:25, 59:2, 21–25, 60:2–8.)

The Plaintiff eventually informed Dr. Bernstein that he "found it difficult to tolerate" the negative effects of the medication. (*See* Sussle Depo. 102:8–25, 103:2–5.) As a consequence, Dr. Bernstein decided to terminate the treatment, (*see* Sussle Depo. 178:6–25, 180:22–25, 181:2–6), and the Plaintiff no longer took the medication after July 1999, (*see* Defs.' Statement ¶ 38; Pl.'s Opp'n Statement ¶ 38.)

When the Plaintiff began to treat his Hepatitis C with the combination therapy in April 1999, he was working for Sirina

---

1. The Defendants question the authenticity of that letter of recommendation. At his deposition, Florez testified that he never wrote the Plaintiff such a letter. (Florez Depo. 64:14–16.) When the Plaintiff's counsel allowed him to review the letter of recommendation, Florez testified that he had never seen the letter before and that he did not recognize the signature on that letter. (Florez Depo. 63:15–25, 64:2–13.)

Protection Systems. (*See* Sussle Depo. 62:4–11; *see also* Defs.' Statement ¶ 38; Pl.'s Opp'n Statement ¶ 38.) Prior to undergoing the treatment, he had never asked Sirina Fire Protection or Sirina Protection Systems for any reasonable accommodations because no accommodations were necessary. (*See* Sussle Depo. 100:25, 101:2–21.) However, on April 6, 1999, the Plaintiff advised Boyle, in writing, that he had been diagnosed with Hepatitis C and that he would require reasonable accommodations. (Sussle Decl. ¶ 6; *see also* Zabell Decl., Ex. J.) He apparently told Boyle that the medication he took to treat his condition could "be trying" and made him tired; as such, he explained to Boyle that he might need some time "to just rest [his] head if [he was] feeling light-headed," to take medicine, to go to the doctor, and that he should not be out in the heat. (*See* Sussle Depo. 114:25, 115:2–19, 118:4–15, 119:2–25.)

According to the Plaintiff, Boyle immediately "grew distant and hostile" towards him and, although Boyle never specifically denied the Plaintiff a reasonable accommodation, he took no affirmative actions to help facilitate any accommodation that the Plaintiff needed. (Sussle Decl. ¶ 7.) Instead, the Plaintiff began to be excluded from business meetings, was not kept informed about important business developments, and was generally "treated like a leper on several occasions." (*See* Sussle Decl. ¶¶ 8, 22; *see also* Sussle Depo. 128:18–25, 129:2–25, 130:2–13.) Boyle allegedly appeared, through his attitude, to have problems with the Plaintiff's illness and Boyle supposedly expressed concern that the Plaintiff's condition was interfering with his work performance. (*See* Sussle Decl. ¶¶ 7, 22.) The Plaintiff is convinced that he would not have been terminated on July 20, 1999, "but for ... Boyle's aversion to [his] illness." (Sussle Decl. ¶ 23.)

## IV. Procedural History

On February 28, 2000, the Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (*See* Defs.' Statement ¶ 28; Pl.'s Opp'n Statement ¶ 28; *see also* Zabell Decl., Ex. D.) In his Charge, the Plaintiff accused the Defendants of disability discrimination. (*See* Defs.' Statement ¶ 29; Pl.'s Opp'n Statement ¶ 29; *see also* Zabell Decl., Ex. D.)

The EEOC issued a "Determination" on February 28, 2001, in which the agency concluded that "there [was] reasonable cause to believe that the [Plaintiff's] allegations [were] true." (Kaiser Decl., Ex. C at 2.) However, the EEOC decided not to bring a lawsuit against the Defendants; instead, on March 23, 2001, the EEOC issued a Notice of Right to Sue to the Plaintiff. (Zabell Decl., Ex. F.)

The Plaintiff commenced the instant action against the Defendants on May 3, 2001. He alleged that the Defendants "discriminated against the Plaintiff in the terms and conditions of his employment because of [his] disability." (Compl.¶ 26.) Accordingly, the Plaintiff asserted that they had violated the ADA, the NYHRL, and the NYCHRL and sought damages. (*See* Compl. ¶¶ 25–31.) The Defendants now move for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

"Summary judgment is appropriate where the Court is satisfied that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed.R.Civ.P. 56(c)). When a district court

considers a motion for summary judgment, the court does not resolve disputed issues of fact but only determines whether there is a genuine issue to be tried. *Eastman Machine Co., Inc. v. United States* (2d Cir.1988) 841 F.2d 469, 473. A dispute regarding a material fact is genuine "if the evidence is such that the a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant." *Marvel Characters, Inc. v. Simon* (2d Cir.2002) 310 F.3d 280, 286.

The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Id.* "Once a movant has demonstrated that no material facts are in dispute, the non-movant must set forth *specific facts* indicating a genuine issue for trial exists in order to avoid the granting of summary judgment." *Cifarelli v. Village of Babylon* (2d Cir. 1996) 93 F.3d 47, 51 (emphasis added). The non-moving party cannot defeat a motion for summary judgment by merely relying "on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas* (2d Cir.1998) 143 F.3d 105, 114. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact. The mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chemical, Inc.* (2d Cir.2003) 315 F.3d 171, 175 (internal citations and quotation marks omitted). Ultimately, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (internal citations omitted).

## II. ADA Claims

### A. Discriminatory Discharge

#### 1. Statutory Framework

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of that individual in regard to," *inter alia,* "[the] discharge of employees." 42 U.S.C. § 12112(a). In this case, the Plaintiff contends that the Defendants discriminated against him on the basis of his disability when they discharged him.

When courts in this circuit consider discrimination claims brought under they ADA, they apply the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, as well as the progeny that sprung therefrom. *Pace v. Paris Maintenance Co.* (S.D.N.Y.) 107 F.Supp.2d 251, 259, *aff'd* (2d Cir.2001) 7 Fed.Appx. 94. Under the *McDonnell Douglas* framework, the "plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.* (2d Cir.1999) 198 F.3d 68, 72; *see also Wernick v. Federal Reserve Bank of New York* (2d Cir. 1996) 91 F.3d 379, 383 ("A plaintiff who raises a disability discrimination claim bears the initial burden of establishing a prima facie case."). If the plaintiff "make[s] out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *Region-*

*al Economic Community Action Program, Inc. v. City of Middletown* (2d Cir.) 294 F.3d 35, 49, *cert. denied* (2002) —— U.S. ——, 123 S.Ct. 74, 154 L.Ed.2d 16. If the defendants furnish such a reason, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 142–143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (internal citations and quotation marks omitted). The plaintiff "must then show that the employer's proffered reason is pretextual and that [the] plaintiff's alleged disability was the real factor motivating the employer's decision." *Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338* (S.D.N.Y.2002) 204 F.Supp.2d 615, 625.

"In order to make out a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability." *Reeves v. Johnson Controls World Services, Inc.* (2d Cir.1998) 140 F.3d 144, 149–150; *see also Ryan v. Grae & Rybicki, P.C.* (2d Cir.1998) 135 F.3d 867, 869–870. As the ensuing discussion explains, the Plaintiff has not established a prima case of disability discrimination because he has failed to demonstrate that he is disabled within the meaning of the ADA.

### 2. Disability Within The Meaning Of The ADA

The ADA protects "qualified individual[s] with a disability" from discrimination. 42 U.S.C. § 12112(a). "A 'qualified individual with a disability' is identified as 'an individual with a *disability* who, with or

without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Sutton v. United Air Lines, Inc.* (1999) 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (quoting 42 U.S.C. § 12111(8)) (emphasis added).

"The ADA provides a deceptively simple definition of disability." *EEOC v. J.B. Hunt Transport, Inc.* (2d Cir.2003) 321 F.3d 69, 74. According to the ADA:

The term 'disability' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(A)-(C). The Defendants argue, *inter alia,* that they did not regard the Plaintiff as if he suffered from the necessary impairment and that the Plaintiff had no record of such an impairment. The Plaintiff does not dispute those arguments. Rather, he contends that a physical impairment interfered with a number of his major life activities. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n Br.") at 14–15.) Accordingly, we focus on whether the Plaintiff has demonstrated that he suffered from "a physical or mental impairment that substantially limit[ed] one or more of [his] major life activities." 42 U.S.C. § 12102(2)(A).

■ "[C]ourts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA." *Stalter v. Board of Cooperative Educational Services of Rockland County* (S.D.N.Y.2002) 235 F.Supp.2d 323, 329; *Epstein v. Kalvin–Miller International, Inc.* (S.D.N.Y. 2000) 100 F.Supp.2d 222, 225. In accor-

dance with this three-step inquiry, a plaintiff must demonstrate the following:

> *First,* [a] plaintiff must show that [he] suffers from a physical or mental impairment. *Second,* [a] plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." *Third,* [a] plaintiff must show that [his] impairment "substantially limits" the major life activity previously identified. If a plaintiff fails to satisfy any of these three prongs, [his] discrimination claim must be dismissed.

*Pimentel v. City of New York* (S.D.N.Y. Dec. 11, 2001) No. 00 Civ. 0326(SAS), 2001 WL 1579553, at *11 (internal citations omitted). We consider whether the Plaintiff has satisfied each of these three prongs seriatim.

#### a. Impairment

■ The ADA does not define the term "impairment." However, the EEOC has issued administrative regulations which implement the ADA. *Reeves,* 140 F.3d at 150. Because the EEOC "is the agency that bears the responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations construing the ADA's terms." *Giordano v. City of New York* (2d Cir.2001) 274 F.3d 740, 747. Those regulations define "a physical or mental impairment" as, among other things, "a physiological disorder or condition" that affects "one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1).

The Plaintiff contends that his Hepatitis C constitutes a "disability." (Sussle Depo. 198:25, 199:2–6; *see also* Defs.' Statement ¶ 36; Pl.'s Opp'n Statement ¶ 36.) Hepatitis C is a viral infection that causes a progressive inflamation of the liver. *See* Stedman's Medical Dictionary 808 (27th ed.2000); *Globe Indemnity Co. v. Mohenis Services, Inc.* (E.D. Pa. June 29, 1998) No. Civ. A. 97–3849, 1998 WL 409026, at *1; *see also McKenna v. Wright* (S.D.N.Y. Mar. 4, 2002) No. 01 Civ. 6571(WK), 2002 WL 338375, at *1 n. 1 ("Hepatitis C is a condition which results in the inflamation of the liver."). The virus, "which infects at least 150,000 Americans each year, 'remains in the blood for years and accounts for a large percentage of cirrhosis, liver failure, and liver cancer cases.'" *Downs v. Hawkeye Health Services, Inc.* (8th Cir. 1998) 148 F.3d 948, 949 n. 2 (citation omitted); *see also Reese v. American Food Service* (E.D.Pa. Sept. 29, 2000) No. Civ.A. 99–1741, 2000 WL 1470212, at *5 ("[Hepatitis C] is generally long-term and can cause serious damage to the liver."); *Sharp v. McDermott Inc.* (E.D.La. Aug. 25, 1997) No. Civ. A. 95–4037, 1997 WL 538002, at *3 ("Hepatitis C ... can cause varying degrees of debilitating and often permanent damage to the liver.").

■ The Defendants do not contest that Hepatitis C is a physical impairment. Moreover, courts have found that Hepatitis C qualifies as a physical impairment under the ADA. *See, e.g. Pimentel,* 2001 WL 1579553, at *11 ("Plaintiff's stated impairment is Hepatitis C, which qualifies as a physical impairment under the ADA."); *Reese,* 2000 WL 1470212, at *5 ("Defendant does not contest that Hepatitis C is an impairment and one quite reasonably could so find."). Given that "Hepatitis C is a long-term disease which can cause egregious damage to the liver, a major and essential organ," *Rollf v. Interim Personnel, Inc.* (E.D.Mo. Nov. 4, 1999) No. 2:99CV44 ERW, 1999 WL 1095768, at *3, we agree with these courts that Hepatitis C is a physical impairment.

### b. Major Life Activities

"Merely having an impairment does not make one disabled for the purposes of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams* (2002) 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615. The plaintiff "also need[s] to demonstrate that the impairment limits a major life activity." *Id.* In this instance, the Plaintiff contends that Hepatitis C substantially limits his ability to reproduce and to engage in sexual activity. (*See* Pl.'s Opp'n Br. at 14–15.) He also mentions, albeit almost in passing, that the medication he took to treat his Hepatitis C "interfered with other daily activities." (*Id.* at 1.)

"Major life activities" are generally "those activities that are of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 197, 122 S.Ct. 681. The ADA does not define which activities fall within that category. *See Gonzalez v. Rite Aid of New York, Inc.* (S.D.N.Y.2002) 199 F.Supp.2d 122, 130. However, the EEOC regulations, "which are accorded 'great deference' by courts," *Glozman,* 204 F.Supp.2d at 621 (quoting *Francis v. City of Meriden* (2d Cir.1997) 129 F.3d 281, 283 n. 1), explain that "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

 As is readily apparent, neither reproduction nor sexual intercourse are listed among the functions recognized as "major life activities" by the EEOC regulations. That list, however, "is meant to be illustrative and not exclusive." *Reeves,* 140 F.3d at 150. The Second Circuit has also "identified other 'major life activities,' including, but not limited to, 'sitting, standing, lifting, or reaching.'" *Colwell v. Suffolk County Police Department* (2d Cir. 1998) 158 F.3d 635, 642, *cert. denied* (1999)

526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (quoting *Ryan,* 135 F.3d at 870). Moreover, the Supreme Court has held that "[r]eproduction falls well within the phrase 'major life activity.'" *Bragdon v. Abbott* (1998) 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540. Because the Plaintiff contends that his Hepatitis C substantially limits his ability to procreate, he has identified at least one major life activity.

 The Plaintiff also contends that Hepatitis C substantially limits his ability to engage in sexual relations. The Second Circuit has not yet addressed the question of whether such conduct constitutes a "major life activity." Nonetheless, other courts have held that "engaging in sexual relations, just like procreation, is a major life activity." *McAlindin v. County of San Diego* (9th Cir.1999) 192 F.3d 1226, 1234, *cert. denied* (2000) 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961; *see also Praseuth v. Newell–Rubbermaid, Inc.* (D.Kan.2002) 219 F.Supp.2d 1157, 1185; *Keller v. Board of Education of City of Albuquerque, New Mexico* (D.N.M.2001) 182 F.Supp.2d 1148, 1155; *Saunders v. Webber Oil Co.* (D.Me. Nov. 17, 2000) No. 99–246–B–H, 2000 WL 1781835, at *6; *Lukens v. National Railroad Passenger Corp.* (E.D.Pa. Oct. 25, 2000) No. Civ.A. 99–4102, 2000 WL 1622745, at *4; *Reese,* 2000 WL 1470212, at *6; *Cornman v. N.P. Dodge Management Co.* (D.Minn.1999) 43 F.Supp.2d 1066, 1072. *But see Qualls v. Lack's Stores, Inc.* (N.D.Tex. Mar. 31, 1999) No. Civ.A. 5:98–CV149–C, 1999 WL 731758, at *2, *aff'd* (5th Cir.2000) 210 F.3d 369 ("The Court finds that sexual intercourse is not a 'major life activity' under the ADA."). "That engaging in normal sexual relations is of relatively great importance to the vast majority of the population requires only the application of common sense." *Saunders,* 2000 WL 1781835, at *5. As the Ninth Circuit aptly explained, "sexuality is

important in how 'we define ourselves and how we are perceived by others' and is a fundamental part of how we bond in intimate relationships." *McAlindin,* 192 F.3d at 1234 (citation omitted); *see also Bragdon,* 524 U.S. at 638, 118 S.Ct. 2196 ("the sexual dynamics surrounding [reproduction] are central to the life process itself"). Engaging in sexual relations is therefore a major life activity.

■ We now come to that obscure category of conduct to which the Plaintiff refers as "other daily activities." (*See* Pl.'s Opp'n Br. at 1.) In the preliminary statement at the outset of his opposition brief, the Plaintiff explains that the medication he once took to treat his Hepatitis C "interfered with other daily activities." (*Id.*) However, he does not elaborate on that statement in the substantive sections of his brief. Rather, his brief focuses exclusively on the manner in which Hepatitis C restricted his reproductive and sexual activities, (*see id.* at 14–15), and leaves the nature and specifics of the "other daily activities" wholly to our imagination. The Plaintiff's failure to identify the major life activities of which this category of conduct consists flies in the face of settled law. The Second Circuit has held that "[t]he need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA." *Reeves,* 140 F.3d at 152. If a plaintiff fails to identify the specific activity limited by his impairment and to establish that it constitutes a major life activity, his ADA claim must be dismissed. *See Pimentel,* 2001 WL 1579553, at *11; *Epstein,* 100 F.Supp.2d at 225.

Thus, if we were to rely on the vagaries of the opposition brief alone, and if the Plaintiff had not already identified two major life activities, we would have to grant summary judgment in favor of the Defendants because of his failure to identify the "other daily activities." The Plaintiff's declaration, however, cures some of the ills perpetuated by the opposition brief. In his declaration, the Plaintiff explains, in pertinent part, that: "My illness and the medications I have had to take because of it has substantially interfered with my ability to concentrate, my ability to walk long distances, to climb stairs, [and] has caused substantially reduced energy levels." (Sussle Decl. ¶ 28.)

■ Walking is a major life activity. *See* 29 C.F.R. § 1630.2(i); *see also Colwell,* 158 F.3d at 642. District courts within the Second Circuit have also held (or at least assumed) that the ability to concentrate is a major life activity. *See EEOC v. J.B. Hunt Transport, Inc.* (N.D.N.Y.2001) 128 F.Supp.2d 117, 132 n. 19, *aff'd* (2d Cir. 2003) 321 F.3d 69; *Williams v. New York State Department of Labor* (S.D.N.Y. May 25, 2000) No. 98 Civ. 3816(RMB), 2000 WL 33175735, at *10; *Lanci v. Arthur Andersen, LLP* (S.D.N.Y. Mar. 29, 2000) No. 96 Civ. 4009(WK), 2000 WL 329226, at *3; *DeMar v. Car–Freshner Corp.* (N.D.N.Y. 1999) 49 F.Supp.2d 84, 89–90; *Glowacki v. Buffalo General Hospital* (W.D.N.Y.1998) 2 F.Supp.2d 346, 351.[2] Climbing stairs likewise qualifies as a major life activity. *Nodelman v. Gruner & Jahr USA Publishing* (S.D.N.Y. Apr. 26, 2000) No. 98 Civ. 1231(LMM), 2000 WL 502858, at *7.

---

**2.** The EEOC has also taken the position that concentrating is a major life activity. *See* 2 EEOC Compliance Manual § 902.3(b), at 902:0007 (BNA 2002) ("Mental and emotional processes such as thinking, concentrating, and interacting with others are other exam-

ples of major life activities."); *but see Pack v. Kmart Corp.* (10th Cir.) 166 F.3d 1300, 1305, *cert. denied* (1999) 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 ("[C]oncentration is not itself a major life activity.").

■ A substantial reduction in energy levels, however, is not a major life activity. An "activity" is ordinarily defined as a "physical motion or exercise of force," such as a "vigorous or energetic action" or an "adroit or skillful physical action," as well as "a process (as moving or digesting) that an organism participates in by virtue of being alive" or "any similar process (as searching, desiring, learning, or writing) that actually or potentially involves mental function." Webster's Third New International Dictionary 22 (1993); *see also* The American Heritage Dictionary of the English Language 17–18 (4th ed.2000) (defining "activity" as, *inter alia,* an "[e]nergetic action or movement" or "[a] specified pursuit in which a person partakes"). In contrast, a substantial reduction in energy levels is, in effect, fatigue, and falls outside the foregoing categories because it is neither the requisite action nor the requisite process. Rather, fatigue, or at least certain categories thereof, might be considered an impairment, *see, e.g. Weixel v. Board of Education of City of New York* (2d Cir. 2002) 287 F.3d 138, 147–148; *Cooney v. Consolidated Edison* (S.D.N.Y.2002) 220 F.Supp.2d 241, 249, *aff'd* (2d Cir.2003) 63 Fed.Appx. 579, 580, or is often a symptom of another impairment, *see, e.g. Rodal v. Anesthesia Group of Onondaga, P.C.* (N.D.N.Y.2003) 250 F.Supp.2d 78, 82; *Bonitch v. Original Honey Baked Ham Co. of the East, Inc.* (E.D.N.Y.1999) 34 F.Supp.2d 154, 158. Since fatigue in and of itself does not constitute an "activity," suffering from fatigue cannot qualify as a major life activity.

### c. Substantial Limitation

The Plaintiff has satisfied the first two prongs of the disability inquiry by sufficiently identifying both an impairment and the major life activities affected thereby. However, that alone, without more, will not suffice. "To constitute a disability, an impairment must not merely affect a major life activity, it must 'substantially limit' that activity." *EEOC v. Yellow Freight System, Inc.* (S.D.N.Y. Sept. 9, 2002) No. 98 Civ. 2270(THK), 2002 WL 31011859, at *13. "Thus, a plaintiff who showed that he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible [to prevail upon a further showing of discrimination] if the limitation of the major life activity was not substantial." *Colwell,* 158 F.3d at 641.

EEOC regulations explain that an impairment "substantially limits" a major life activity where an individual is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)-(ii).

"In other words, the ADA protects only a limited class of persons – individuals who suffer from impairments significantly more severe than those encountered by ordinary people in everyday life." *Aquinas v. Federal Express Corp.* (S.D.N.Y.1996) 940 F.Supp. 73, 77. The term " '[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' " *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 197, 122 S.Ct. 681 (citation omitted). "The word 'substantial' thus clearly precludes impairments" from qualifying as disabilities where they "interfere in only a minor way" with the performance of a major life activity. *Id. See also Albertson's, Inc. v. Kirkingburg* (1999) 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518

(a "mere difference" does not amount to a "significant restrict[ion]" and therefore does not satisfy the EEOC's interpretation of the phrase "substantially limits"). Rather, " '[t]o be substantially limited in performing [a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must be permanent or long-term.' " *Tojzan v. New York Presbyterian Hospital* (S.D.N.Y. Mar. 31, 2003) No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *6 (quoting *Toyota Motor Mfg., Kentucky, Inc.*, 534 U.S. at 198, 122 S.Ct. 681).

The Plaintiff does not suggest that he is altogether unable to reproduce, engage in sexual relations, walk, concentrate, or climb stairs. Rather, he contends that his Hepatitis C restricts his reproductive and sexual activities and that the medication he once took to treat the viral infection interfered with his ability to concentrate, to walk, and to climb stairs. We evaluate the evidence before us to determine whether the Plaintiff is disabled within the meaning of the ADA.

### (i) The Plaintiff's Failure To Present Medical Evidence

In his opposition brief, the Plaintiff asserts that Hepatitis C "substantially interfered with his sexual relationships as well as his ability to have children" and that the medication he previously took to treat his condition "interfered with other daily activities." (Pl.'s Opp'n Br. at 1; *see also id.* at 14 ("Mr. Sussle's hepatitis C substantially limited his life activities of reproduction and sexual activity....").) The record with respect to these issues consists, in large measure, of the Plaintiff's declaration and a transcript of his deposition testimony. In his declaration and at his deposi-

tion, the Plaintiff described various limitations which he attributed to Hepatitis C. These descriptions were based wholly on his personal characterizations of those limitations. The Plaintiff never cited or otherwise referred to any medical evidence to substantiate the extent of his limitations.

District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, "without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA." *Douglas v. Victor Capital Group* (S.D.N.Y.1998) 21 F.Supp.2d 379, 392; *see also Fagan v. United International Insurance Co.* (S.D.N.Y.2001) 128 F.Supp.2d 182, 186 n. 2 ("A person alleging a disability protected by the ADA has [the] burden of establishing with medical evidence the existence of the alleged disability...."); *Monroe v. Cortland County, New York* (N.D.N.Y. 1999) 37 F.Supp.2d 546, 551 n. 3 (internal citations omitted) ("Claims of disability have been rejected for failure to submit any supporting medical evidence ... This lack of evidence demonstrates that no reasonable jury could conclude Plaintiff was disabled in this respect under the federal statutes."); *Zuppardo v. Suffolk County Vanderbilt Museum* (E.D.N.Y.1998) 19 F.Supp.2d 52, 56, *aff'd* (2d Cir.1999) 173 F.3d 848, 1999 WL 197205, at *1 (citation omitted) (where the plaintiff "failed to supply ... a single hospital record, doctor's report, expert deposition testimony, or any medical proof whatsoever," no reasonable jury " 'could conclude that the plaintiff was disabled within the meaning of the ADA' "); *Charlotten v. May Department Stores Co.* (S.D.N.Y. Sept. 16, 1998) No. 97 Civ. 8962(HB), 1998 WL 635547, at *4 ("[T]here is no medical evidence—such as an affidavit from her physician—that her medical conditions significantly restricted her ability to perform other jobs. Given

this lack of evidence, no reasonable jury could conclude that the plaintiff was disabled within the meaning of the ADA."); *Johnson v. St. Clare's Hospital & Health Center* (S.D.N.Y. May 13, 1998) No. 96 Civ. 1425(MBM)(AJP), 1998 WL 236235, at *8, *aff'd* (2d Cir.1999) 175 F.3d 1008, 1999 WL 97232, at *1 ("Johnson has failed to offer any *medical* evidence substantiating the specific limitations to which he claims he is subject due to this condition ... Johnson therefore has failed to establish a prima facie case."). *Cf. Cruz Carrillo v. AMR Eagle, Inc.* (D.P.R.2001) 148 F.Supp.2d 142, 145 ("[Plaintiff] failed to introduce into evidence any medical evidence from which a reasonable jury could find that HIV substantially limits a man's ability to reproduce ... [His] testimony, without more, is not enough to shoulder his burden of showing a substantial limitation. He is not an expert in the medical field of immunology or reproduction, and ... no objective evidence has been presented to support his position."); *Dumas v. Arthur Andersen LLP* (N.D.Ill. Jan. 28, 2000) No. 98 C 5394, 2000 WL 139470, at *3 ("Plaintiff points to no medical evidence supporting he was disabled. All he has is his own testimony that he had poor concentration, got tired running, and could not lift more than ten pounds. Plaintiff has failed to establish that he had an impairment that substantially limited a major life activity."); *Polderman v. Northwest Airlines, Inc.* (N.D.Ohio 1999) 40 F.Supp.2d 456, 463 ("Plaintiff's testimony as to her ability to work with the public, without supporting medical testimony, is not sufficient to establish her prima facie case under the ADA.").

■ These cases persuade us that where the Plaintiff relies solely on his own testimony and fails "to offer any *medical* evidence substantiating the specific limitations to which he claims he is subject due

to his condition," *Johnson*, 1998 WL 236235, at *8, he cannot establish that he is disabled within the meaning of the ADA. "Bald or self-serving assertions in affidavits [and depositions], unsubstantiated by documentation or other testimony, are not sufficient to create a material issue of fact as to whether an impairment has substantially limited a major life activity." *Stein v. Ashcroft* (7th Cir.2002) 284 F.3d 721, 726; *see also Contreras v. Suncast Corp.* (7th Cir.2001) 237 F.3d 756, 764, *cert. denied* (2001) 534 U.S. 824, 122 S.Ct. 62, 151 L.Ed.2d 29.

We are cognizant that certain courts disagree with the necessity of medical evidence in ADA cases. For example, the First Circuit has held that "[t]here is ... no general rule that medical testimony is always necessary to establish disability. Some long-term impairments would be obvious to a lay jury (*e.g.*, a missing arm) and it is certainly within the realm of possibility that a plaintiff himself in a disabilities case might offer a description of treatments and symptoms over a substantial period that would put the jury in a position where it could determine that he did suffer from a disability within the meaning of the ADA." *Katz v. City Metal Co., Inc.* (1st Cir.1996) 87 F.3d 26, 32. The Third Circuit agrees with the First Circuit, and has held that "the necessity of medical testimony turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge." *Marinelli v. City of Erie, Pennsylvania* (3d Cir.2000) 216 F.3d 354, 360.

The First Circuit and Third Circuit's approach to the necessity of medical evidence in ADA cases contradicts the standard endorsed by the Second Circuit in *Heilweil v. Mount Sinai Hospital* (2d Cir. 1994) 32 F.3d 718, 723, *cert. denied* (1995) 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d

1063. There, a plaintiff sued the defendant for a violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq. Id.* at 719. As in an ADA case, the Plaintiff needed to establish that she had an impairment which substantially limited one or more of her major life activities.[3] *Id.* at 722. Since the plaintiff argued that she suffered from a physical impairment that substantially limited her ability to work, she had to demonstrate that her impairment disqualified her from more than a narrow class of jobs. *Id.* at 723. In an effort to meet this burden, the plaintiff declared that " 'her disability made it impossible for her to work in *any* poorly ventilated place.' " *Id.* However, the Second Circuit found that no medical proof substantiated that assertion and held that "to defeat a motion for summary judgment, a plaintiff cannot rely on 'conjecture or surmise,' and 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Id.* (internal citations omitted).

■ In accordance with the Second Circuit's decision in *Heilweil,* a plaintiff cannot merely rely on his own testimony to demonstrate that a physical impairment substantially limits his performance of a major life activity. He needs to submit medical evidence to substantiate his statements; to allow otherwise would ensure that a plaintiff could defeat a motion for summary judgment on the basis of conjecture or surmise. We are bound by the decisions of the Second Circuit and not those of the First Circuit or the Third Circuit. In conformity with *Heilweil,* as well as with *Douglas, Monroe, Zuppardo, Charlotten,* and *Johnson,* the Plaintiff's failure to substantiate the extent of his limitations with medical evidence precludes him from establishing that he suffers from a disability within the meaning of the ADA.

Even if we were to follow the evidentiary standards espoused in *Katz* and *Marinelli,* the Plaintiff would still be unable to defeat the motion for summary judgment before us for several reasons. First, the ailments in the instant case do not fall within the same category of impairments found in *Katz* and *Marinelli.* In addition, those cases focused in large measure on whether the plaintiff's personal testimony could establish an "impairment" within the meaning of the ADA; in contrast, we have already found that the plaintiff has demonstrated that he suffers from an "impairment." Instead, the question before us is whether the plaintiff can show that his impairment substantially limited one or more major life activities.

In *Katz,* the plaintiff suffered a heart attack, which made breathing, walking,

---

**3.** The Rehabilitation Act prohibits the same type of disability discrimination as the ADA. *See Bartlett v. New York State Board of Law Examiners* (2d Cir.2000) 226 F.3d 69, 78 n. 2. The " 'ADA and the Rehabilitation Act have similar regulatory schemes,' " and, " '[i]n employment discrimination cases, the elements of a prima facie case and available defenses are identical under both statutes.' " *Smith v. State University of New York* (N.D.N.Y. Apr. 23, 2003) No. 1:00-CV1454 (FJS/RFT), 2003 WL 1937208, at *7 n. 9 (quoting *Worthington v. City of New Haven* (D.Conn. Oct. 5, 1999) No. 3:94-CV-00609 (EBB), 1999 WL 958627, at *6); *see also Kilcullen v. New York State Department of Labor* (2d Cir.2000) 205 F.3d 77, 79 n. 1, *overruled on other grounds, Board of Trustees of University of Alabama v. Garrett* (2001) 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (internal citations omitted) ("The ADA, adopted in 1992, is broader in scope [than the Rehabilitation Act], reaching individuals and entities that do not receive federal funds. While the statutes are not absolutely congruent in their other requirements, they impose identical obligations on employers."); *Rodriguez v. City of New York* (2d Cir.1999) 197 F.3d 611, 618, *cert. denied* (2000) 531 U.S. 864, 121 S.Ct. 156, 148 L.Ed.2d 104 ("Section 504 of the Rehabilitation Act and the ADA impose identical requirements ... [and] we consider these claims in tandem.").

working, caring for himself, and performing manual tasks difficult. *Katz*, 87 F.3d at 28–30. The First Circuit held that the plaintiff's testimony alone, without expert medical testimony, sufficiently demonstrated that he had a physical impairment. *Id.* at 31. However, the court faced a more difficult issue when it examined whether the plaintiff's testimony established that his impairment significantly restricted major life activities. *See id.* at 31–32. The nature of the plaintiff's testimony was of particular concern to the First Circuit. *See id.* at 32. His testimony regarding the long-term effects of his heart attack was far more general and far less specific then his testimony about the immediate effects of the heart attack. *Id.* at 32. Ultimately, the First Circuit chose not to resolve whether "expert medical testimony was necessary for the case to go forward on a theory of actual disability." *Id.* Instead, the court held that the plaintiff's evidence allowed him "to reach [a] jury under one of the alternative definitions of disability." *Id.*

In *Marinelli*, the plaintiff suffered neck and back injuries after a pick-up truck collided with his snow-plow. *Marinelli*, 216 F.3d at 357. The defendant argued that the plaintiff's "ADA claim should fail because he [had] not introduced *any* medical evidence to support his allegations of impairment." *Id.* at 360. The Third Circuit found that arm and neck pain were the type of impairments that were "the least technical in nature and the most amenable to comprehension by a lay jury." *Id.* at 361. Hence, the court held that the plaintiff's "failure to present medical evidence of his impairment, in and of itself, [did] not warrant judgment as a matter of law in favor" of the defendant. *Id.*

This case differs from *Katz* and *Marinelli* in several respects. Where those courts focused on whether a plaintiff's personal testimony could establish that he had an impairment, we have already concluded that the Plaintiff has satisfied the "impairment" prong of the disability inquiry. Moreover, the Plaintiff has offered this Court no reason to believe that the nature of Hepatitis C is amenable to comprehension by a lay jury in the same manner as are such common ailments as neck and arm pain as well as heart attacks. To the contrary, cases which delve into the intricacies of Hepatitis C often rely heavily on medical evidence, medical encyclopedias, or diagnostic manuals. *See, e.g., Downs*, 148 F.3d at 949 n. 2; *McKenna*, 2002 WL 338375, at *1 n. 1; *White v. Bank of America Corp.* (N.D.Tex. Nov. 2, 2000) No. Civ.A.3:99–CV–2329–G, 2000 WL 1664162, at *3–*4, *aff'd* (5th Cir.2001) 265 F.3d 1059; *Reese*, 2000 WL 1470212, at *5; *Rollf*, 1999 WL 1095768, at *3. Where the impairments in *Katz* and *Marinelli* were the least technical in nature, Hepatitis C is not. That critical factor alone distinguishes the instant case from those decisions. Since Hepatitis C is not readily amenable to comprehension by a lay jury, medical evidence was necessary to substantiate the extent of the Plaintiff's alleged limitations.

Moreover, neither the First Circuit in *Katz* nor the Third Circuit in *Marinelli* actually held that the plaintiff's personal testimony was sufficient to demonstrate a substantial limitation on any major life activity. The same is true of the Plaintiff's testimony here. We arrive at that conclusion by evaluating the record before us. In the discussion that follows, we examine whether the Plaintiff's deposition testimony and declaration establish that Hepatitis C significantly restricted his reproductive and sexual activities. We also consider whether that evidence sufficiently demonstrated that the medication he took for four to five months to treat his Hepatitis C

significantly restricted his ability to concentrate, to walk, and to climb stairs.

### (ii) Limitations Imposed By Hepatitis C And The Medication

### a) Limitations Attributed To Hepatitis C

### 1) Individualized Inquiry

People afflicted with Hepatitis C, an infectious disease, may well find that their ability to procreate or have sexual intercourse is limited by that condition. *See Reese,* 2000 WL 1470212, at *6. However, we will not treat Hepatitis C as if it were a *per se* disability. *See Wilson v. Aetna Life and Casualty Co.* (W.D.N.Y. 2002) 195 F.Supp.2d 419, 427 ("[T]here are no *per se* rules as to what is or what is not a disability."). A *per se* approach would contravene the applicable standard articulated by the Supreme Court. In recent years, the Supreme Court has consistently held that "the existence of a disability [must] be determined in . . . a case-by-case manner." *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 198, 122 S.Ct. 681; *see also Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 ("[W]hether a person has a disability under the ADA is an individualized inquiry."); *Albertson's, Inc.,* 527 U.S. at 566, 119 S.Ct. 2162 (ADA imposes a "statutory obligation to determine the existence of disabilities on a case-by-case basis."); *cf. Bragdon,* 524 U.S. at 641–642, 118 S.Ct. 2196 (declining to address whether HIV infection is a *per se* disability). Therefore, "[t]he determination of whether an individual is disabled under the ADA is made on an individualized, case-by-case basis." *Reeves,* 140 F.3d at 151.

In short, a plaintiff who seeks to show that he is disabled within the meaning of the ADA must do more than "merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 198, 122 S.Ct. 681. He must offer "evidence that the extent of the limitations [caused by [his] impairment] in terms of *[his] own experience* . . . is substantial." ' *Id.* (quoting *Albertson's, Inc.,* 527 U.S. at 567, 119 S.Ct. 2162) (emphasis added).

As a consequence, a plaintiff cannot prevail on an ADA disability discrimination claim where he merely submits evidence that he suffers from Hepatitis C. Whether Hepatitis C is a disability within the meaning of the ADA depends upon how that impairment affects a specific plaintiff in a particular case. *See Quick v. Tripp, Scott, Conklin & Smith, P.A.* (S.D.Fla.1999) 43 F.Supp.2d 1357, 1367. This "individualized inquiry" conforms with both the standard set forth by the Supreme Court, *see Sutton,* 527 U.S. at 483, 119 S.Ct. 2139, as well as with common sense because, although Hepatitis C is a serious illness, some people are more badly affected than others. *See Sharp,* 1997 WL 538002, at *3. Thus, the relevant question is not whether Hepatitis C *ordinarily* limits the reproductive and sexual activities of those infected with the virus. Instead, a court must focus on whether the plaintiff has produced evidence that *he* suffers from such limitations. *See Reese,* 2000 WL 1470212, at *6. If the plaintiff fails to meet that evidentiary burden, his Hepatitis C will not be considered a disability under the ADA, regardless of whatever medical generalizations can be made about the harms often associated with that condition.[4] *See id.*

---

**4.** The Plaintiff, relying on *Powell v. City of Pittsfield* (D.Mass.2002) 221 F.Supp.2d 119, 146–147, appears to suggest that we should treat Hepatitis C as if it were a *per se* disability. (*See* Pl.'s Opp'n Br. at 14–15.) In that case, Judge Ponsor noted that "courts have repeatedly found that [Hepatitis C] substantially limits a major life activity because of its

With those considerations in mind, we turn to the evidence in the record.

## 2) Reproduction And Sexual Relations

 The Plaintiff contends that Hepatitis C "substantially interfered with his sexual relationships as well has his ability to have children." (Pl.'s Opp'n Br. at 1; *see also id.* at 14 ("Mr. Sussle's hepatitis C substantially limited his life activities of reproduction and sexual activity....").) However, the Plaintiff does not offer any specific evidence to show that Hepatitis C significantly restricted his ability to procreate or to engage in sexual relations as compared to the way in which the average person in the general population can procreate or engage in sexual relations. "Without specific evidence ... the jury could not perform the careful analysis that is necessary to determine that [the Plaintiff] was substantially limited in his ability" to perform a major life activity. *Colwell,* 158 F.3d at 645; *see also Pimentel,* 2001 WL 1579553, at *13.

Neither the Plaintiff's declaration nor his deposition testimony provide specific information regarding the degree to which

impairment of the individual's reproductive and sexual activity." *Powell,* 221 F.Supp.2d at 146.

The Plaintiff's reliance on *Powell* is misplaced. First, the plaintiff in *Powell* provided the district court with medical evidence which demonstrated that "hepatitis C was transmitted through sexual activity and the exchange of bodily fluids" and could cause cirrhosis, liver failure, cancer, and death. *Id.* at 147. The court found that this evidence sufficiently established that the plaintiff could not choose to be intimate with his wife without the risk of endangering her life. *Id.* As such, the court concluded that "hepatitis C 'significant[ly] restrict[ed] the ... manner or condition under which' [the plaintiff] could engage in reproduction or sexual relations 'as compared to the average person in the general population's ability to perform that same major life activity." ' *Id.* (quoting 29 C.F.R. § 1630.2(j)).

The circumstances in *Powell* are readily distinguishable from the circumstances in the instant case. Here, the Plaintiff has offered no similar medical evidence. Unlike the *Powell* court, we therefore have no evidentiary means by which to gauge how the Plaintiff's Hepatitis C medically affected his sexual relations and his ability to procreate. *See Cruz Carrillo,* 148 F.Supp.2d at 145 (plaintiff failed to show that his HIV infection restricted his ability to reproduce where he provided no medical evidence to establish the risks associated with HIV).

Furthermore, to the extent that the court in *Powell* arguably treated Hepatitis C as if it were a *per se* disability, we decline to follow in *Powell'*s footsteps. Treating an impairment as a *per se* disability conflicts with the "individualized inquiry" standard that courts must apply when they evaluate whether a particular plaintiff is disabled under the ADA. *See Sutton,* 527 U.S. at 483, 119 S.Ct. 2139.

The seminal ADA decision on infectious diseases and reproductive limitations, *Bragdon v. Abbott,* demonstrates how the requisite standard must be applied. In *Bragdon,* the Supreme Court chose not to treat HIV as if it were a *per se* disability. *Bragdon,* 524 U.S. at 641–642, 118 S.Ct. 2196. Instead, the plaintiff's ADA claim survived a motion for summary judgment on the basis of specific evidence. The Supreme Court found that HIV substantially limited the plaintiff's ability to reproduce where she had testified that her infection controlled her decision not have a child and no one had challenged that testimony. *Id.* at 641; *see also Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 198, 122 S.Ct. 681 (characterizing *Bragdon* in the same manner).

As *Bragdon* illustrates, an ADA claim does not turn on the generalizations associated with a medical diagnosis, even where a plaintiff finds herself afflicted with an infectious disease. The plaintiff in *Bragdon* successfully resisted a motion for summary judgment by introducing specific evidence which established that HIV controlled her reproductive decisions. As our review of the record confirms, the Plaintiff has offered no such evidence to demonstrate that, in his experience, Hepatitis C significantly restricted his ability to have children and to engage in sexual intercourse.

Hepatitis C limited his reproductive and sexual activities. In his declaration, the Plaintiff asserts, in a general fashion, that his illness "greatly limits [his] ability to have children in the future. In addition the illness because of its infectious nature greatly interferes with [his] sexual relations and is a major issue in any new sexual relationship into which [he] enter[s]." (Sussle Decl. ¶ 28.) However, he does not describe with any specificity how Hepatitis C limited his performance of these major life activities.

If anything, the Plaintiff's deposition testimony contradicts his contention that Hepatitis C "substantially interfered with his ... ability to have children." (Pl.'s Opp'n Br. at 1.) At his deposition, the Plaintiff described a number of relationships wherein he found himself unable to have children with his girlfriends for reasons unrelated to his illness.

The first of these relationships lasted for approximately six years, (see Sussle Depo. 36:9–20), and ended at about the time or just after he began to work for Sirina Fire Protection, (see Sussle Depo. 37:9–20), namely around January 1998, (see Defs.' Statement ¶ 2; Pl.'s Opp'n Statement ¶ 2). Over the course of that relationship, the Plaintiff and his girlfriend discussed whether they would have children, but they mutually resolved not to do so because *she* could not physically conceive a child. (See Sussle Depo. 37:21–25, 38:2–24.) After that relationship ended, and while the Plaintiff was working for the Defendants, he dated a second woman for approximately one year. (See Sussle Depo. 39:20–25, 40:2–6.) She and the Plaintiff also discussed whether they would have children but chose not do so because, like his prior girlfriend, *she* was physically unable to conceive children. (See Sussle Depo. 40:7–13; *see also* Zabell Decl., Ex. M (noting that the Plaintiff's "girlfriend

has had a hysterectomy").) When that second relationship fell apart, the Plaintiff took a break from dating. (*See* Sussle Depo. 41:5–13.) However, after he was no longer working for the Defendants, the Plaintiff dated a third woman for approximately one year (i.e. from around 2001 to 2002). (*See* Sussle Depo. 41:14–25, 42:2–6.) The Plaintiff testified that he and this third girlfriend went their separate ways both because he could not afford her "lifestyle" and because she was afraid that she could "catch" Hepatitis C from the Plaintiff; however, the Plaintiff also testified that having children with this girlfriend was not a possibility for the sole reason that "[s]he was looking for somebody to take care of her financially" and the Plaintiff was not earning enough money to do so. (*See* Sussle Depo. 42:7–25, 43:2–25, 44:2–4.) Finally, around one month after his third relationship ended, he began to date a fourth woman (whom he was still seeing at the time of his deposition in July 2002). (*See* Sussle Depo. 44:5–9.) The Plaintiff chose not to discuss the possibility of having children with this fourth girlfriend because *he* wanted to "leave [his] options open." (*See* Sussle Depo. 44:10–16.)

Nothing in the Plaintiff's deposition testimony or his declaration suggests that Hepatitis C affected his ability to procreate. To the contrary, his deposition testimony establishes that he did not have children with the foregoing girlfriends between 1992 and 2002 for reasons wholly unrelated to Hepatitis C. A plaintiff's impairment "does not substantially limit reproduction when [the] [impairment] does not affect the [plaintiff's] decision of whether to have children." *O'Loughlin v. Dominick's Finer Foods* (N.D.Ill. Apr.19, 2001), No. 99 C 8301, 2001 WL 1753500, at *5. In this instance, the Plaintiff was unable to have children with the first two aforementioned girlfriends (whom he col-

lectively dated for approximately seven years) because of *their* physical inability to conceive a child. He did not have children with his third girlfriend because she was apparently looking for someone to support her financially and he could not afford to do so. He did not have children with his fourth girlfriend, at least as of July 2002, because he chose not to discuss the subject with her; that choice allowed him to leave his "options open." In the absence of any specific evidence that Hepatitis C, rather than other factors, circumscribed procreation with his girlfriends, the Plaintiff has failed to demonstrate that the impairment significantly restricted his ability to reproduce.

■ To the extent that the Plaintiff seeks to circumvent the effect of his deposition testimony by vaguely suggesting that Hepatitis C "greatly limits [his] ability to have children *in the future*," (Sussle Decl. ¶ 28) (emphasis added), that argument misses the mark. A plaintiff must demonstrate that he was " 'substantially limited during . . . the time span when [he] [was hired and fired by the defendant.]' " *Jacques v. DiMarzio, Inc.* (E.D.N.Y.2002) 200 F.Supp.2d 151, 157 (quoting *Horwitz v. L. & J.G. Stickley, Inc.* (E.D.N.Y.2000) 122 F.Supp.2d 350, 355, *aff'd* (2d Cir.2001) 20 Fed.Appx. 76 (citing *Taylor v. Phoenixville School District* (3d Cir.1999) 184 F.3d 296, 308)); *see also Georgy v. O'Neill* (E.D.N.Y. Mar. 25, 2002) No. 00–CV–0660 (FB), 2002 WL 449723, at *9 (same); *Barr v. New York City Transit Authority* (E.D.N.Y. Feb. 20, 2002) No. 99–CV–7927 (FB), 2002 WL 257823, at *3 (same); *Cameron v. Navistar International Transportation Corp.* (N.D.Ill.1998) 39 F.Supp.2d 1040, 1046 (medical records pertaining to the plaintiff's condition after his termination by the defendant did not shed light on whether he was substantially limited at the relevant time); *Kalekiristos v. CTF*

*Hotel Management Corp.* (D.D.C.) 958 F.Supp. 641, 657–658, *aff'd* (D.C.Cir.1997) 132 F.3d 1481, 1997 WL 812530, at *1 (granting motion for summary judgment where the record in the action was devoid of any evidence that the plaintiff was unable to perform major life activities "during the period of the alleged disability discrimination").

Here, the Plaintiff dated the first two aforementioned girlfriends on or around the time that he worked for the Defendants and these girlfriends were physically unable to conceive a child. (*See* Sussle Depo. 36:9–20, 37:9–25, 38:2–24, 39:20–25, 40:2–13; *see also* Zabell Decl., Ex. M.) In other words, during the course of his employment with the Defendants, the Plaintiff did not have children because of his girlfriends' limitations rather than as a result of his condition. As such, there is no evidence that Hepatitis C significantly restricted his ability to procreate during the relevant time period.

Moreover, even if we could look beyond the time span of the alleged disability discrimination, the evidence before us does not establish that Hepatitis C will substantially limit the Plaintiff's ability to reproduce in the future. The Plaintiff, who is almost sixty-years old, (*see* Zabell Decl., Ex. H at 1 (noting that the Plaintiff was born in 1944)), does not definitively indicate that he intends or would like to have children. Rather, his deposition testimony leaves open the possibility that he might simply prefer not have children in the future. (*See* Sussle Depo. 38:25, 39:2–5 ("Q: Are you currently planning on having any children? A: I'm not planning, I'm not not planning. I'm leaving that open. I haven't ruled it out.").) Nothing in the record suggests that this personal choice will depend on the factor of his illness, rather then on some other factor, such as age. The Plaintiff introduced no specific

evidence to show that the infectious nature of his impairment will influence his decision to have children in the years ahead. Accordingly, the Plaintiff "has utterly failed to present any evidence that his condition [will affect] his reproductive choices, and this Court will not fill the void with assumptions." *O'Loughlin,* 2001 WL 1753500, at \*5; *cf. Gutwaks v. American Airlines, Inc.* (N.D.Tex. Sept. 2, 1999) No. 3:98–CV–2120 (BF), 1999 WL 1611328, at \*4–\*5 (impairment did not substantially limit the plaintiff's ability to reproduce where "[h]is decision not to have children was a personal one, not caused by his [impairment]").

The Plaintiff also did not produce specific evidence to corroborate the degree to which Hepatitis C restricted his sexual activities. He does not suggest that he embraced celibacy after he learned that he suffered from Hepatitis C and abstained from sexual intercourse so as to prevent the transmission of the infection. He still "enter[s]" into "sexual relationship[s]," although he contends that the "infectious nature" of his illness "greatly interferes with [his] sexual relations" and is a "major issue" in those relationships. (Sussle Decl. ¶ 28.) Despite these general statements, the Plaintiff never explains with any specificity the nature of that interference. Rather, he testified in a very cursory manner at the close of his deposition that Hepatitis C affected his "ability to ... [have] unprotected sex." (Sussle Depo. 199:7–18.) However, the record does not substantiate that vague reference. The Plaintiff indicates nothing more than that when he "meet[s] a woman, [he] first [has] to tell her that—when a relationship starts escalating to a more intimate level, [he] feel[s] obligated to explain to them that [he][has] hepatitis C." (Sussle Depo. 55:20–25, 56:2–6.)

In essence, the Plaintiff has presented only conclusory statements and has failed to specify the extent to which Hepatitis C interfered with his sexual relations. Even if a reasonable jury could infer from his vague assertions that Hepatitis C restricted his ability to engage in "unprotected sex," no reasonable jury could find from the evidence before us that this restriction rose to the level of a substantial limitation. The evidence is insufficient because "[t]he use of a condom during intercourse, at least without more, does not constitute a substantial limitation on one's sex life." *Qualls,* 1999 WL 731758, at \*3. We need not decide when, or if, the use of a condom substantially limits sexual intercourse. Where there is no evidence that a plaintiff with Hepatitis C used a condom regularly during sex, no jury could find that the infection significantly limited his sexual activities. *See Reese,* 2000 WL 1470212, at \*6; *Qualls,* 1999 WL 731758, at \*3.

Nothing in the record suggests that the Plaintiff used a condom regularly during sex with his girlfriends, much less that his use thereof significantly restricted his ability to engage in sexual intercourse as compared to the manner in which the average person engages in sexual intercourse. Of particular significance, the Plaintiff offered no evidence to establish that he used a condom regularly when, and if, he had sexual intercourse with the two women whom he dated while he was working for the Defendants in 1998 and 1999. As such, he has not shown that he was " 'substantially limited during ... the time span when [he] [was hired and fired by the defendant.]' " *Jacques,* 200 F.Supp.2d at 157 (citation omitted). Where, as here, the Plaintiff fails to produce specific evidence to demonstrate that Hepatitis C significantly restricted his sexual activities, "[o]ne cannot reasonably find from the record presented that [the][P]laintiff's sexual

practices have been significantly limited." [5] *Reese,* 2000 WL 1470212, at *6. *Cf. Colwell,* 158 F.3d at 645.

In sum, the Plaintiff rests his case, by and large, on the contention that Hepatitis C "substantially limits" his reproductive and sexual activities as if those words alone were a mantra, the repetition of which could establish a prima facie case of disability discrimination. However, in order to resist summary judgment, a party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The phrase "substantially limits" is not a talismanic chant which, without more, can defeat a motion for summary judgment. *See Huizenga v. Elkay Mfg.* (N.D. Ill. June 5, 2001) No. 99 C 50287, 2001 WL 640973, at *6 (quoting *Moore v. J.B. Hunt Transport, Inc.* (7th Cir.2000) 221 F.3d 944, 952) ("Parker's affidavit and portions of Huizenga's affidavit barely go beyond the language of the ADA ... [T]his evidence does not provide 'specific facts; it is merely conclusory, restating the requirements of the law.' "); *Beaudoin v. Customized Transportation Inc.* (E.D. Mich. June 28, 2000) No. 98–75330, 2000 WL 1022964, at *4 (internal citation omitted) ("Beaudoin fails to proffer any evidence to demonstrate the precise limitations of his impairment, nor does he indicate specifically what causes his symptoms. Merely offering conclusory arguments are insufficient ... [B]ecause Beaudoin cannot show a substantial limitation in his life activity of working, he has failed to establish a genuine issue of material fact that he is disabled."); *De-Mar,* 49 F.Supp.2d at 91 (quoting *Kulak v. City of New York* (2d Cir.1996) 88 F.3d 63, 71) ("Notably absent from Plaintiff's allegations are specific facts or evidence demonstrating that Plaintiff is substantially limited in his ability to concentrate in comparison to the general population ... [N]either 'conclusory statements, conjecture, [n]or speculation' suffices to defeat summary judgment."). Since the Plaintiff does not proffer any specific facts, even via non-medical evidence, to corroborate that Hepatitis C substantially limited his ability to reproduce and to engage in sexual relations, he has failed to demonstrate that he is disabled within the meaning of the ADA.

**b) Limitations Attributed To The Medication**

■ The Plaintiff does not rely on his Hepatitis C alone to establish a substantial limitation. He also contends that the "medication he was required to take [to treat his Hepatitis C] interfered with other daily activities." (Pl.'s Opp'n Br. at 1.) He somewhat elaborates on that otherwise cursory contention by explaining that the medication substantially limited his ability to concentrate, to walk, and to climb stairs. (*See* Sussle Decl. ¶ 28; Sussle Depo. 62:22–25, 63:2–25, 64:2–18.)

■ When a court evaluates whether an individual is disabled within the meaning of the ADA, the court must consider the negative side effects which that individual suffers from the use of mitigating measures. *EEOC v. J.B. Hunt Transportation, Inc.* (N.D.N.Y.2001) 128 F.Supp.2d 117, 125 n. 12, *aff'd* (2d Cir.2003) 321 F.3d 69; *see also Wilson,* 195 F.Supp.2d at 427; *Epstein,* 100 F.Supp.2d at 224. Any consideration of the combination therapy's

---

**5.** The absence of any specific evidence regarding the extent to which the Plaintiff used a condom also lends further support to our conclusion that Hepatitis C did not significantly restrict his ability to procreate. There is no evidence that the Plaintiff used a condom with sufficient regularity such that the contraceptive substantially interfered with his ability to have children.

side effects, however, is of little benefit to the Plaintiff. The record before us demonstrates that the negative symptoms associated with the Hepatitis C treatment did not substantially limit the Plaintiff's ability to walk, to climb stairs, or to concentrate.

Notably, the Plaintiff admits that he only subjected himself to the treatment from April 1999 until July 1999. (*See* Defs.' Statement ¶ 38; Pl.'s Statement ¶ 38.) That is, he took the drugs for four to five months. The record does not suggest that the medication's side effects continued to plague the Plaintiff after Dr. Bernstein terminated the treatment in July 1999.

■ According to the relevant EEOC regulations, the following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) the duration or the expected duration of the impairment; and

(iii) The permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2)(i)-(iii). Since courts must take into account both the duration and the long-term impact of an impairment when they evaluate whether the limitations attributed to that impairment are substantial, a " 'transitory impairment is not considered substantially limiting.' " *Fagan,* 128 F.Supp.2d at 185 (quoting *Murray v. Sysco Corp.* (N.D.N.Y. Apr. 2, 1998) No. 96–CV–1073 (RSP/DNH), 1998 WL 160826, at *8); *see also Graaf v. North Shore University Hospital* (S.D.N.Y.1998) 1 F.Supp.2d 318, 321 ("Courts within this circuit, and the vast majority of courts elsewhere that have

considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary injuries are not disabled persons within the meaning of the act.").

Where a plaintiff takes Interferon and Ribavirin to treat his Hepatitis C for only a few months, no reasonable jury could find that the medication's negative side effects substantially limited that plaintiff's ability to perform a major life activity. *See Pimentel,* 2001 WL 1579553, at *12–*13. The Plaintiff here took the medication for approximately four to five months. In the absence of any evidence that the Plaintiff suffered negative effects from the medication after his treatment ended, the limitations which the medication imposed on his ability to concentrate, to walk, or to climb stairs during those four to five months were of insufficient duration to constitute a substantial limitation. *See Colwell,* 158 F.3d at 646 (impairment which limited a plaintiff's ability to work for seven months was "of too short a duration ... to be 'substantially limiting' "); *Sanders v. Arneson Products, Inc.* (9th Cir.1996) 91 F.3d 1351, 1354, *cert. denied* (1997) 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (impairment lasting less than four months was not substantially limiting); *Jacques,* 200 F.Supp.2d at 158 (impairment that affected the plaintiff's ability to drive and to perform some errands for six months was of insufficient duration to be substantial).

Moreover, the actual limitations which the Plaintiff attributed to the treatment cannot be considered substantial limitations. "Treatment for Hepatitis C affects patients differently." *Pimentel,* 2001 WL 1579553, at *12. The Plaintiff testified that, in his case, the drugs caused fatigue and thereby affected his ability to concentrate, to walk, and to climb stairs. However, he conceded that the treatment did not

affect his concentration for most of the working day, and on some days not at all. (*See* Sussle Depo. 66:2–16.) Moreover, the drugs only affected his ability to walk long distances and the plaintiff did climb stairs during that period, although doing so made him tired. (*See* Sussle Decl. ¶ 28; Sussle Depo. 122:9–15, 123:5–24.)

The "inability to walk long distances or to climb stairs does not in itself substantially limit" an individual's ability to perform a major life activity. *Stewart v. Weast* (D.Md.2002) 228 F.Supp.2d 660, 662; *see also Weber v. Strippit* (8th Cir. 1999) 186 F.3d 907, 914, *cert. denied* (2000) 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (a plaintiff who had "difficulty walking long distances or climbing stairs without getting fatigued" suffered from only "moderate limitations on major life activities [which] d[id] not suffice to constitute a 'disability' under the ADA"); *Kelly v. Drexel University* (3d Cir.1996) 94 F.3d 102, 106–108 (a plaintiff who could not walk long distances and had trouble climbing stairs was not substantially limited in a major life activity); *Shaw v. Greenwich Anesthesiology Associates, P.C.* (D.Conn. 2001) 137 F.Supp.2d 48, 55 n. 7 (a plaintiff's inability to walk long distances did not qualify as a substantial limitation); *Vaughnes v. United Parcel Service, Inc.* (S.D.N.Y. Aug. 14, 2000) No. 97 Civ. 5849(SHS), 2000 WL 1145400, at *6 (a plaintiff who could not walk long distances or climb down stairs without holding on to a handrail did not demonstrate a substantial limitation); *Hazeldine v. Beverage Media, Ltd.* (S.D.N.Y.1997) 954 F.Supp. 697, 704 n. 2 (inability to walk long distances or to climb up and down stairs without experiencing " 'shortness of breath' " were not significant restrictions on a major life activity); *Stone v. Entergy Services, Inc.* (E.D. La. June 20, 1995) No. Civ. A. 94–2669, 1995 WL 368473, at *3–*4 (plaintiff's

post polio residuals did not substantially limit his ability to perform a major life activity where he merely had trouble climbing stairs). In addition, where an individual finds it difficult to concentrate only on occasion, his ability to concentrate is not substantially limited. *See Clarke–Hughes v. Western Auto Supply Co.* (S.D.Ohio Sept. 19, 2000) No. C2–99–689, 2000 WL 1459454, at *5; *cf. Vande Zande v. State of Wisconsin Department of Administration* (7th Cir.1995) 44 F.3d 538, 544 ("Intermittent, episodic impairments are not disabilities...."). Because the Plaintiff failed to produce any evidence that his Hepatitis C treatment substantially limited a major life activity, and therefore qualified as a disability within the meaning of the ADA, his disability discrimination claim fails as a matter of law. *See Pimentel*, 2001 WL 1579553, at *14.

### B. Failure To Accommodate

An employer discriminates against an individual in violation of the ADA when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is ... an employee." 42 U.S.C. § 12112(b)(5)(A); *see also Johnson v. Maynard* (S.D.N.Y. Feb. 25, 2003) No. 01 Civ. 7393(AKH), 2003 WL 548754, at *3. In order to establish a prima facie case of discrimination based upon an employer's failure to accommodate a disability, the plaintiff must show "(1) that the employer is subject to the statute under which the claim is brought, (2) that [he] is an individual with a disability within the meaning of the statute in question, (3) that, with or without reasonable accommodation, [he] could perform the essential functions of the job, and (4) that the employer had notice of the plaintiff's disability and failed to provide such accommodation." *Lyons v. Legal Aid Society* (2d Cir.1995) 68 F.3d 1512, 1515; *see also Lovejoy–Wilson v.*

*NOCO Motor Fuel, Inc.* (2d Cir.2001) 263 F.3d 208, 216.

In his Complaint, the Plaintiff alleges that the "Defendants failed to reasonably accommodate his disability." (Compl. ¶ 5; *see also* Compl. ¶ 16 ("Defendants refused to provide any reasonable accommodations to Sussle.").) To the extent that these allegations could arguably be read to state a failure to accommodate claim, that claim must also be dismissed. For the extensive reasons enumerated *supra*, the Plaintiff failed to demonstrate that he is disabled within the meaning of the ADA. As such, his failure to accommodate claim, if any, fails as a matter of law and the Defendants' motion for summary judgment is granted with respect to that cause of action.

## C. Retaliation

■■■■■ Although no retaliation claim can be found in the Complaint, the Plaintiff now alleges that the Defendants retaliated against him in violation of the ADA when they purportedly discharged him because he asked for reasonable accommodations. (*See* Pl.'s Opp'n Br. at 13–14.) The ADA prohibits retaliation against any individual who asserts rights under the ADA. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.* (2d Cir.1999) 183 F.3d 155, 158; *see also* 42 U.S.C. § 12203(a). This prohibition protects individuals from retaliation when they seek a reasonable accommodation for their disability. *See Weixel*, 287 F.3d at 148.

"To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment ac-

tion." *Sarno*, 183 F.3d at 159. "The fact that [the][P]laintiff was not actually disabled within the meaning of the ADA does not affect his retaliation claim, since the statute requires only that he have contacted the EEOC with the good-faith belief that the [Defendants'] conduct was unlawful under the ADA." *Taylor v. Lenox Hill Hospital* (S.D.N.Y. Apr. 3, 2003) No. 00 Civ. 3773(GEL), 2003 WL 1787118, at *6 (citing *Sarno*, 183 F.3d at 159); *see also Muller v. Costello* (2d Cir.1999) 187 F.3d 298, 311 (Second Circuit's decision in *Sarno* precludes argument that an ADA retaliation claim cannot stand "in the absence of a finding that [the plaintiff] was actually disabled within the meaning of the ADA."); *Greco v. County of Nassau* (E.D.N.Y.2001) 146 F.Supp.2d 232, 244 ("The court's finding that Plaintiff is not disabled within the meaning of the ADA does not necessarily preclude Plaintiff from proceeding with his retaliation claim.").

We will assume *arguendo* that the Plaintiff had a good-faith belief that the Defendants violated the ADA when he contacted the EEOC. Nonetheless, several factors lead us to grant summary judgment in favor of the Defendants with respect to his retaliation claim. First, the Plaintiff did not include a retaliation claim in his Complaint. The allegations therein are straightforward. The Plaintiff contends that the "Defendants failed to reasonably accommodate his disability and ultimately terminated him because of his disability." (Compl.¶ 5.) Thereafter, under the heading "The Disability Discrimination," the Plaintiff alleges that the "Defendants fired Sussle because of his disability." (Compl. ¶ 18; *see also* Compl. ¶ 21 ("Defendants terminated Sussle because of his disability.").) For those reasons, the Plaintiff brought causes of action against the Defendants pursuant to the ADA, the NYHRL, and the NYCHRL in which he

argued that they "discriminated against [him] in the terms and conditions of his employment because of [his] disability." (Compl. ¶¶ 25–27; *see also* Compl. ¶¶ 28–31.)

■ Nowhere in his Complaint does the Plaintiff suggest that the Defendants engaged in retaliatory conduct. Instead, the lawsuit here is a classic disability discrimination action and involves no claim for retaliation. We will not consider a retaliation claim which a plaintiff did not include in his complaint and which he presents for the first time in a brief that responds to a motion for summary judgment. *Turner v. McKune* (D.Kan. Dec. 21, 2001) No. Civ.A. 00–3456–KHV, 2001 WL 1715793, at *3 n. 1; *see also O'Rourke v. Pitney Bowes, Inc.* (S.D.N.Y. July 31, 1997) No. 95 Civ. 10288(DLC), 1997 WL 431091, at *11 n. 17 (refusing to consider claims that were not raised in the amended complaint where no further amendment was sought or granted).

■ Even if the first cause of action in the Complaint could be construed as if it were an ADA claim for retaliation, that claim must still be dismissed because the Plaintiff failed to exhaust his administrative remedies when he did not include allegations of retaliation in the Charge he filed with the EEOC. A district court may decide claims "under the ADA only after a plaintiff has exhausted [his] administrative remedies." *Santos v. City of New York* (S.D.N.Y. Dec. 7, 2001) No. 01 Civ. 0120(SAS), 2001 WL 1568813, at *2; *see also Ofori–Awuku v. Epic Security* (S.D.N.Y. Feb. 23, 2001) No. 00 Civ. 1548(AGS), 2001 WL 180054, at *3. Thus, a district court only has jurisdiction to hear such claims where they were either included in an EEOC charge or are based on conduct subsequent to the charge which is "reasonably related" to that alleged in the EEOC charge. *Butts v. City of New York*

*Department of Housing Preservation and Development* (2d Cir.1993) 990 F.2d 1397, 1401, *superceded by statute on other grounds as stated in Hawkins v. 1115 Legal Service Care* (2d Cir.1998) 163 F.3d 684; *see also Pearson–Fraser v. Bell Atlantic* (S.D.N.Y. Jan. 6, 2003) No. 01 Civ. 2343(WK), 2003 WL 43367, at *2.

In the Charge he filed with the EEOC, the Plaintiff merely averred that the Defendants had engaged in disability discrimination. (*See* Zabell Decl., Ex. D.) He included no references to retaliation. (*Id.*) As such, we only have jurisdiction to hear his ADA retaliation claim if that claim is based on conduct subsequent to the ADA charge which is "reasonably related" to the conduct alleged in the EEOC charge.

"Where the EEOC charge alleges discrimination but not retaliation the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive." *Gambrell v. National Railroad Passenger Corp.* (S.D.N.Y. Feb. 3, 2003) No. 01 Civ. 6433(NRB), 2003 WL 282182, at *8; *see also Harris v. New York City Department of Homeless Services Eligibility Investigation Unit* (S.D.N.Y. Apr. 28, 1998) No. 97 Civ. 0432(SAS), 1998 WL 205334, at *9, *aff'd* (2d Cir.1999) 181 F.3d 82, 1999 WL 314158, at *1 (where the EEOC charge alleged a claim for discrimination but not one for retaliation, reasonable scope of the agency's investigation could not be expected to encompass the retaliation claim); *Chinn v. City University of New York School of Law at Queens College* (E.D.N.Y.1997) 963 F.Supp. 218, 223–224 (same); *Abdal–Rahim v. New York City Department of Health Bureau of Laboratories* (S.D.N.Y. Feb. 1, 1990) No. 88 Civ. 7355(MBM), 1990 WL 8577, at *1 (same). The Plaintiff's retaliation claim is therefore not "reasonably related" to the disability

discrimination claim he articulated in the EEOC Charge.

 Moreover, the Plaintiff's retaliation claim is "premised upon his request for reasonable accommodation," (*see* Pl.'s Opp'n Br. at 13), which he made before he was fired on July 20, 1999, and before he filed his Charge with the EEOC on February 28, 2000. The "reasonably related" doctrine does not excuse a plaintiff's failure to include allegations in his administrative complaint where those allegations pertained to conduct that had occurred before the administrative complained was filed. *Hall v. City of New York* (S.D.N.Y. Mar. 27, 2002) No. 00 Civ. 8967(GEL), 2002 WL 472057, at *4. "The rule does not permit a plaintiff to bring suit based on alleged prior acts … that could have been, but were not, asserted in the EEOC charge that was filed." *Id.* The Plaintiff had an opportunity to assert his allegations about the Defendants' prior retaliatory conduct when he filed his Charge in February 2000. Because he failed to do so, he cannot demonstrate that his retaliation claim is "reasonably related" to the disability discrimination claim set forth in the Charge.

 The Plaintiff relies on a Questionnaire he submitted to the EEOC to circumvent the consequences which must follow from his failure to allege a retaliation claim in the Charge. (*See* Pl.'s Opp'n Br. at 14; *see also* Zabell Decl., Ex. H.) In that Questionnaire, the Plaintiff enumerated allegations of retaliation. (*See* Zabell Decl., Ex. H at 3, 7–8.) However, "it is the charge rather than the questionnaire that matters." *Novitsky v. American Consulting Engineers, L.L.C.* (7th Cir. 1999) 196 F.3d 699, 702. "A charge of discrimination enables the EEOC to investigate the allegations and negotiate with the employer." *Id.* at 701. "Only the charge is sent to the employer, and there-

fore only the charge can affect the process of conciliation." *Id.* at 702. Hence, courts will not consider claims presented in such a questionnaire in determining the scope of an EEOC charge where the plaintiff signed and submitted an actual charge. *See Habib–Stevens v. Trans States Airlines, Inc.* (E.D.Mo.2002) 229 F.Supp.2d 945, 946. The Plaintiff's reliance on the Questionnaire is therefore misplaced and the Questionnaire does not extend the scope of his EEOC Charge.

 In any event, the Plaintiff has failed to establish a prima facie case of retaliation. In order to demonstrate the necessary causal connection between his request for reasonable accommodations in April 1999 and his termination on July 20, 1999, the Plaintiff relies on the supposed temporal proximity of these two events. (*See* Pl.'s Opp'n Br. at 13 ("[The Plaintiff's] retaliation claim is premised upon his request for reasonable accommodation which occurred within a short time of his firing."); *cf. id.* at 11–12.) Proof of a causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia University College of Physicians & Surgeons* (2d Cir.1988) 842 F.2d 590, 593. However, "the longer the interval between the protected activity and the adverse employment action, the more attenuated becomes the evidence of the requisite causation." *Spadola v. New York City Transit Authority* (S.D.N.Y.2003) 242 F.Supp.2d 284, 294. That is, the causal connection "cannot be established where the adverse action is too remote in time from the alleged protected activity." *Gross v. National Broadcasting Co., Inc.* (S.D.N.Y.2002) 232 F.Supp.2d 58, 74.

 The four-month interval between the Plaintiff's request for reasonable ac-

commodations in April 1999 and his termination in July 1999 is insufficient evidence of a causal connection. "For mere temporal proximity to establish causality, the intervening period must be 'very close.'" *Gordon v. New York City Board of Education* (S.D.N.Y. Jan. 23, 2003) No. 01 Civ. 9265(SAS), 2003 WL 169800, at *9 (quoting *Clark County School District v. Breeden* (2001) 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509). "Although there is no bright line test for how close in time the adverse action must be to the protected activity, courts have held ... less time to be insufficient." *Gordon*, 2003 WL 169800, at *9. *See Hollander v. American Cyanamid Co.* (2d Cir.1990) 895 F.2d 80, 85–86 (passage of three months between the protected activity and the adverse action was too long a time period to suggest a causal relationship); *Nicastro v. Runyon* (S.D.N.Y.1999) 60 F.Supp.2d 181, 185 ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.") In fact, courts have repeatedly held that a fourth-month interval does not establish a causal connection for the purposes of a retaliation claim. *See Cooper v. Morgenthau* (S.D.N.Y. July 31, 2001) No. 99 Civ. 11946(WHP), 2001 WL 868003, at *8 ("[T]he three month and three week lapse between Cooper's termination and the filing of this federal action does not in this instance establish a causal connection between the filing of her complaint and her termination."); *Cobian v. New York City* (S.D.N.Y. Dec. 6, 2000) No. 99 Civ. 10533(KMW)(AJP), 2000 WL 1782744, at *17–*18, *aff'd* (2d Cir.2001) 23 Fed.Appx. 82 ("The lapse of more than four months between Cobian's filing of her EEOC charge in October 1998 and her lack of assignment starting, at the very earliest, sometime in March 1999, is insufficient evidence of a causal connection" to establish retaliation.); *Stringfellow v. Wyckoff Heights Medical Center* (E.D.N.Y. Sept. 9, 1998) No. 95 CV 3041, 1998 WL 760286, at *6 ("Stringfellow cannot satisfy the 'causal connection' requirement of this retaliation claim. He was terminated on January 18, 1994, more than four months after he filed a complaint with the EEOC ... [A] lapse of this magnitude counsels against a causal connection."). Since the Plaintiff has failed to establish a causal connection between the protected activity and the adverse employment action, he is unable to make out a prima facie case of retaliation.

### III. NYHRL And NYCHRL Claims

The Plaintiff also asserts claims for disability discrimination under the NYHRL and the NYCHRL. (*See* Compl. ¶¶ 28–31.) These claims are "analytically distinct" from disability discrimination claims brought pursuant to the ADA. *Epstein*, 100 F.Supp.2d at 229. The definitions of disability enumerated in the NYHRL and the NYCHRL are broader than the ADA definition. *Giordano*, 274 F.3d at 753. As such, the Plaintiff's failure to establish that he suffers from a disability within the meaning of the ADA does not necessarily vitiate his NYHRL and NYCHRL claims. *See Johns–Davila v. City of New York* (S.D.N.Y. Nov. 20, 2000) No. 99 Civ. 1885(RMB)(AJP), 2000 WL 1725418, at *12.

We need not, however, reach the merits of his NYHRL and NYCHRL claims. Since these state and municipal claims do not invoke any federal questions, they "can only be brought to federal court by way of either diversity of citizenship pursuant to 28 U.S.C. § 1332, or supplemental jurisdiction, in conformance [with] 28 U.S.C. § 1367(a)." *Karmel v. Claiborne, Inc.* (S.D.N.Y. July 15, 2002) No. 99 Civ. 3608(IWK), 2002 WL 1561126, at *2. "The statutory concept of supplemental

jurisdiction codified and expanded somewhat the earlier judge-made doctrines of pendent and ancillary jurisdiction." *Purgess v. Sharrock* (2d Cir.1994) 33 F.3d 134, 138. A district court may exercise pendent jurisdiction over state law claims "whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Carnegie–Mellon University v. Cohill* (1988) 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (quoting *United Mine Workers of America v. Gibbs* (1966) 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218). None of the parties before us contend that diversity of citizenship exists. Instead, the Plaintiff alleges that our jurisdiction to hear his NYHRL and NYCHRL claims is founded upon the principles of pendent, and therefore supplemental, jurisdiction. (*See* Compl. ¶ 4.)

The statute which governs supplemental jurisdiction, 28 U.S.C. § 1367, "provides courts with the discretionary authority to dismiss remaining state claims when all federal claims have been dismissed prior to trial." *Taylor*, 2003 WL 1787118, at *9 (citing 28 U.S.C. § 1367(c)). Indeed, the Second Circuit has held that "in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by the New York state and municipal law is a question best left to the courts of the State of New York . . . [Thus,] the state-law claims should be dismissed so that the state courts can, if so called upon, decide for themselves whatever questions of state law this case may present." *Giordano*, 274 F.3d at 754. *Cf. Carnegie–Mellon University*, 484 U.S. at 350 n. 7, 108 S.Ct. 614 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Marcus v. AT & T Corp.* (2d Cir.1998) 138 F.3d 46, 57 ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Accordingly, the Plaintiff's NYHRL and NYCHRL claims are dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, we hereby GRANT the Defendants' motion for summary judgment as to all of the Plaintiff's ADA claims. The Plaintiff's remaining NYHRL and NYCHRL claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**SO ORDERED.**