**Robert WORSTER Plaintiff**

v.

**CARLSON WAGON LIT TRAVEL, INC. Defendant**

**No. 3:02 CV 167(EBB).**

United States District Court, D. Connecticut.

Jan. 4, 2005.

Peter D. Goselin, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT, for Plaintiff.

Karl M. Terrell, Stokes & Murphy, College Park, GA, for Defendant.

James T. Cowdery, Cowdery, Ecker & Murphy, Hartford, CT, for Defendant and Counter–Claimant.

Deborah L. McKenna, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT, for Plaintiff and Counter–Defendant.

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Senior District Judge.

The plaintiff Robert Worster has sued his former employer Carlson Wagonlit Travel, Inc. (hereinafter "Defendant" or "Carlson") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et.seq., as amended by the Civil Rights Act of 1991, the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a–60, and the federal Family and Medical Leave Act (FMLA), 29 U.S.C. § 2611 et. seq. Specifically, the plaintiff alleges that his former employer discriminated against him as a result of his alleged disability and his use of FMLA leave and retaliated against him as a result of his opposition to the alleged discrimination and his exercise of rights under the FMLA. Additionally, the plaintiff has brought a state law claim for negligent infliction of emotional distress. The defendant has moved for summary judgment on all counts.

### Statement of Facts

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The facts are distilled from the Complaint, the parties memoranda of law and exhibits thereto, and the parties' Local Rule 56 Statements.

The plaintiff began working for Carlson in 1988 in the Carlson ticketing department. In 1995, Mr. Worster was laid off due to a reduction in force. He was recalled in 1997 to work in the Meeting Services Department as a "group air reservationist". In January of 1999, he was promoted to lead travel counselor and then again, in October 1999, to meeting planner.

In early 1999, the plaintiff was diagnosed with Lyme disease and experienced various physical symptoms, including recurring head aches and fatigue, and absences from work.

In approximately July 1999, Wayne Fischer became the plaintiff's immediate supervisor. In October 1999, plaintiff was hospitalized for one week. In early November 1999, plaintiff and a co-worker, Kim Mascone, were reassigned to another department to help answer and service incoming calls to the call center for "the

Pearson account." When reassigned to the Pearson account, plaintiff's duties involved fielding phone calls and taking and placing travel reservations for the clients' employees. By contrast, as a meeting planner, Mr. Worster had worked one on one with a group, planning all of the group's travel arrangements. Plaintiff's pay was not reduced while assigned to the Pearson account and he does not claim that he was demoted or lost his title. On November 24, 1999 and again on January 6, 2000, Fischer informed both Worster and Mascone that the loan of their services would be extended in the Pearson account.

On November 29, 1999, Fischer gave Worster a formal warning as a result of several absences and indicated that the next step would be further disciplinary action up to and including termination. Subsequently, on December 7, 1999, the plaintiff produced a Certification of Physician and a formal request for intermittent leave pursuant to the FMLA. Plaintiff requested the intermittent leave as an accommodation to his alleged physical disability. According to Mr. Worster's physician, he was unable to work when he was feeling intense fatigue and would need to arrive late or leave early as a result of the fatigue. Carlson granted the leave prospectively, as well as retroactively to August 1999, and kept plaintiff in the position servicing the Pearson account. Carlson stated that the position in the Pearson account was more flexible, and therefore, more appropriate given plaintiff's intermittent leave. Under the intermittent leave granted, plaintiff had the right "when fatigued" to take days off, come in late or leave early, without suffering disciplinary action. Along with approval of the leave, the November 29, 1999 disciplinary warning was removed from Mr. Worster's personnel file.

On or about January 28, 2000, the plaintiff met with his supervisor Fischer and two representatives of Human Resources, Jo Ann House and Joan Garrett (who participated by phone). Plaintiff stated that he was unhappy with his schedule working on the Pearson account and wanted a fixed schedule. Fischer told plaintiff in the presence of the Human Resources representatives that he was not willing to return him to group responsibilities in light of his attendance. ("I can't count on you being at work because of your medical condition.") At the meeting, Ms. Garrett made clear to Fischer that these comments were inappropriate. Carlson denied the plaintiff's request to return him to his former position on the basis that the position in the Pearson account afforded Carlson more flexibility to accommodate Mr. Worster's intermittent leave.

On January 28, 2000, Mr. Worster filed a complaint with the Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC) alleging that Carlson was discriminating against him because of his status as a person with a disability in violation of the federal and state antidiscrimination laws. In February 2000, House informed Mr. Worster that in order to meet his accommodation request, Carlson would keep him on the Pearson account until he could return to the Meeting Department full time.

While the plaintiff was on intermittent leave, Carlson learned that he was working a second job at a restaurant. By letter dated March 16, 2000, Carlson informed Mr. Worster:

> If illness-related fatigue is aggravated by the fact you are working a secondary job, and could be avoided by relinquishing the secondary job, than [sic] Carlson's obligation to accommodate you is similarly eliminated. While we are not

requesting at this time a relinquishment of the secondary job as a condition to retaining your leave rights, we will monitor attendance and the impact on attendance caused by the secondary job.

House testified that she spoke with plaintiff regarding the second job, and that her understanding was that plaintiff had reduced his work at the restaurant to one shift a week and would be quitting soon.

On March 17, 2000, the plaintiff learned that he was HIV positive. By letter dated May 5, 2000, the plaintiff requested a full-time personal leave of absence to extend from May 15, 2000 through the summer, ending September 18, 2000. By letter dated May 9, 2000, Carlson confirmed that the leave was for non-medical reasons and that, pursuant to plaintiff's request, the Company would grant a renewable personal unpaid leave of 30 days.

Around this time, plaintiff spoke with Ms. House regarding the option for a paid medical leave of absence, under which he would be eligible for salary continuation and continuation of company-paid benefits. Plaintiff elected to revoke his request for personal leave and instead made a request for FMLA leave. He submitted his request and provided Ms. House with a Certification of Physician stating that he had been diagnosed as HIV-positive and that he was presently incapacitated as a result of "extreme fatigue." Carlson's FMLA leave policy allowed for 100 percent payment for the first 268.50 hours of FMLA leave and thereafter 50 percent of pay for the remaining leave under the policy. Plaintiff's leave began on May 12, 2000 and would expire on July 6, 2000 at which time plaintiff could submit a request to extend the leave.

On May 18, 2000, pursuant to his new request for FMLA leave, plaintiff signed a document entitled "Notice to Employee of Rights and Obligations Under the Family and Medical leave Act". Paragraph 17 of this document provided as follows:

You must not engage in gainful employment during FMLOA. Noncompliance with this restriction, or fraud in obtaining a FMLOA will result in termination of employment in addition to other rights of the company if that occurs including potential recovery of the Company's share of health or dental premiums during FMLOA to the extent not prohibited by law.

While on leave and unbeknownst to Carlson, plaintiff relocated to Cape Cod where he took a job at a restaurant called Chesters. By letter dated June 28, 2000 and a subsequent note dated July 6, 2000, Mr. Worster sought to renew his medical leave. Carlson informed him that he would need to present certification from his doctor for continued medical leave. During the week of July 16, 2000, defendant received an anonymous fax, that appeared to be from a Carlson employee, stating that plaintiff was working at Chesters in Provincetown, Cape Cod. On July 18, 2000, Ms. House made a phone call to the restaurant and was told that Mr. Worster was expected in around 4:30. On July 19, 2000, Ms. Garrett telephoned Chesters and this call also confirmed that a Robert Worster was employed there.

While defendant was investigating whether the plaintiff was gainfully employed while on leave, the plaintiff attempted to contact Carlson regarding the extension of his FMLA leave and paid benefits. On July 19, 2000, plaintiff telephoned defendant regarding the request for extending his leave. He stated that "that is my income. I am a sick person, . . ."

In the meantime, there were ongoing settlement discussions to settle the plaintiff's CHRO complaint filed in February

2000. One of the four conditions for settlement proposed by the plaintiff was that Carlson "waive all legal actions for benefits/wages collected during employment." On or around July 24, 2000 Ms. Garrett spoke with Tom Brainerd of the CHRO regarding the proposed settlement. Ms. Garrett informed Mr. Brainerd that Carlson rejected the proposed settlement. On July 25, 2000, Ms. Garrett sent Mr. Worster a letter to his Provincetown work address, informing him that Carlson was terminating his employment. In this letter, Ms. Garrett informed Mr. Worster that Carlson believed that he had deceitfully obtained his FMLA leave and threatened to sue him for recovery of benefits.

On or around August 21, 2000, the plaintiff filed a second administrative charge, alleging retaliation for opposing discriminatory conduct and additional claims of disability discrimination. This litigation followed.

### The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). Although the moving party has the initial burden of establishing that no factual issues exist, "[o]nce that burden is met, the opposing party must set forth specific facts demonstrating that there is a genuine issue for trial." *Sylvestre v. United States*, 771 F.Supp. 515, 516 (D.Conn.1990).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. In this regard, mere assertions and conclusions of the party opposing summary judgment are not enough to defend a well-pleaded motion. *Lamontagne v. E.I. DuPont de Nemours & Co.*, 834 F.Supp. 576, 580 (D.Conn.1993), aff'd 41 F.3d 846 (2d Cir.1994).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), cert. denied, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505 (scintilla of evidence in support of plaintiff's position insufficient; there must be evidence from which a jury could reasonably find in his favor). *See also, Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless that such cases may involve state of mind or intent. "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would

operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original).

### Discussion

### FIRST COUNT *Discrimination Under ADA*

#### Statutory Framework

The Plaintiff first brings a claim for discrimination based on physical disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Specifically, Mr. Worster claims that the defendant discriminated against him by "disciplining, demoting, and terminating his employment." The plaintiff's ADA claim appears to be that the defendant discriminated against him on the basis of his alleged disability, HIV positive status, when it terminated his employment.[1]

Section 42 U.S.C. § 12112(a) of the ADA states in pertinent part: "No covered entity shall discriminate against a qualified individual because of the disability of such individual in regard to ... discharge of employees, employee compensation ... and other terms, conditions, and privileges of employment." Discrimination claims under the ADA are analyzed using the framework developed under Title VII. *See Bonura v. Sears Roebuck & Co.*, 62 Fed. Appx. 399, 400 n. 4, 2003 WL 21024620 (2d Cir.2003). Under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff must first establish a prima facie case of discrimination. This requires that "the claimant ... show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).

The plaintiff's burden at the prima facie stage is de minimis. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). "Once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Terry, supra* at 138. Finally, "if the defendant proffers such a [legitimate, nondiscriminatory] reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.... The plaintiff must be afforded the

---

1. The plaintiff's CFEPA claim, on the other hand, appears to be that (1) Carlson discriminated against him on the basis of his alleged disability Lyme disease when it (a) transferred him to the Pearson account in November

1999 and (b) refused to return him to his former position in early 2000; and also that (2) Carlson discriminated against him on the basis of his alleged disability HIV positive status when it terminated his employment.

opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir.2002) (internal quotation marks and citations omitted). In other words, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry*, 336 F.3d at 138 (internal quotation marks omitted). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of Carlson on the ADA claim.

The ADA protects "qualified individual[s] with a disability" from discrimination. 42 U.S.C. § 12112(a). "A 'qualified individual with a disability' is identified as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (quoting 42 § U.S.C. 12111(8)). The ADA defines a disability, in relevant part, as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment". 42 U.S.C. § 12102(2)(A)-(C)).

The plaintiff's ADA claim is based on alleged discriminatory treatment as a result of the plaintiff's HIV positive status. First, there is a considerable question whether Mr. Worster can establish a prima facie case under the ADA. Additionally, summary judgment is proper because Mr.

Worster has failed to present any evidence that would be sufficient to permit a rational finder of fact to infer that the Carlson's legitimate, nondiscriminatory reasons for its actions in terminating Mr. Worster's employment were a pretext for discrimination.

 Plaintiff fails to meet his burden of establishing a *prima facie* case of discrimination under the ADA. Mr. Worster contends that HIV positive status constitutes a physical impairment which substantially limited the major life activities of reproduction and sexual activity. First, HIV positive status does not qualify as a matter of law as a per se disability in this Circuit. In *Sutton v. United Air Lines*, 527 U.S. 471, 482–84, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court made clear that disability claims must be subjected to an "individualized inquiry." The definition of disability also requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual." § 12102(2). Thus, whether a person has a disability under the ADA is an individualized inquiry. *See Bragdon v. Abbott*, 524 U.S. 624, 641–642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (declining to consider whether HIV infection is a per se disability under the ADA); 29 CFR pt. 1630, App. § 1630.2(j) ( "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). Under *Sutton*, it is not enough for a plaintiff to show simply that he or she has a certain disease which may "potentially or hypothetically" be disabling. *Id.* Instead, a plaintiff must show that his or her impairment, in fact, "substantially limits a major life activity." *See Colwell v. Suffolk Coun-*

*ty*, 158 F.3d 635, 643 (2nd Cir.1998). A plaintiff's impairment "does not substantially limit reproduction when [the] [impairment] does not affect the [plaintiff's] decision of whether to have children." *Sussle v. Sirina Protection Systems Corp.*, 269 F.Supp.2d 285, 307 (S.D.N.Y.2003) (*citing O'Loughlin v. Dominick's Finer Foods*, No. 99 C 8301, 2001 WL 1753500, at *5 (N.D.Ill. April 19, 2001)). In *Sussle*, a former employee sued his employer under the ADA alleging discrimination and retaliation, contending that his alleged disability, Hepatitis C, substantially limited his ability to reproduce and to engage in sexual activity. The Court concluded that the plaintiff could not demonstrate that his impairment restricted his ability to reproduce, in the absence of any specific evidence that the alleged disability, and not other factors, restricted his ability to reproduce.

In *Blanks v. Southwestern Bell*, 310 F.3d 398, 401 (5th Cir.2002), the Fifth Circuit Court of Appeals held that an HIV-positive male who had decided with his wife "not to have any more children and [whose] wife underwent a procedure to prevent her from having any more children" was not disabled within the meaning of the ADA, because reproduction is not a major life activity for *this* individual. *See also Gutwaks v. American Airlines*, 1999 WL 1611328, *4 (N.D.Tex.1999) (denying a claim of disability, noting that while the plaintiff in *Bragdon* "testified that her HIV status dictated her decision not to have children . . . it is apparent that here reproduction is not a major life activity for Gutawks," who "admits that he does not currently, nor has he ever, desired to father children.")

Plaintiff fails to provide evidence that his alleged disability caused him to be substantially limited in the major life activities of reproduction or sexual activity.

For example, plaintiff has failed to provide any evidence of permanent or long term impact on his major life activities of reproduction. Rather, plaintiff has testified that he had no plans to have children. The Court agrees with the defendant that plaintiff is not unable to reproduce, and, that in any event, reproduction, at the time relevant to this Complaint, was not a major life activity for plaintiff. In the absence of any specific evidence that plaintiff's alleged disability, rather than other factors, circumscribed reproduction, the plaintiff has failed to demonstrate that the impairment significantly restricted his ability to reproduce. *Sussle*, 269 F.Supp.2d at 308. Similarly, plaintiff has testified that his impairment has not effected his sexual activity. To the extent that a jury could infer from his assertions that his HIV positive status restricted his ability to engage in unprotected sex, no reasonable jury could find from the evidence that this restriction rose to the level of a substantial restriction. *See Id.*, at 309. Nor has plaintiff shown that his impairment affects any other major life activity. Nor has the plaintiff, with regard to this claim, proffered any evidence that Carlson regarded him as disabled or that he had a record of having a disability.

Because plaintiff cannot meet his prima facie burden under the ADA, this claim is dismissed. Even if Mr. Worster could sustain his burden of putting forth a prima facie case, his claim under the ADA nevertheless fails for reasons discussed at length below, i.e., the plaintiff fails to proffer any credible evidence that Carlson's reason for terminating his employment is pretextual.

**COUNT TWO** *Discrimination under CFEPA*

The plaintiff's CFEPA claim appears to be that (1) Carlson discriminated against him on the basis of his alleged disability,

Lyme disease, when it (a) transferred him to the Pearson account in November 1999 and (b) refused to return him to his former position in early 2000; and that (2) Carlson discriminated against him on the basis of his alleged disability, HIV positive status, when it terminated his employment. The Court addresses each possible claim.

Under CFEPA, it is a discriminatory employment practice to discharge from employment any individual ... because of the individual's ... physical disability, including but not limited to, blindness. Conn. Gen.Stat. § 46a–60(a)(1). Discriminatory claims brought under the CFEPA are construed similarly to that of ADA claims, with the Connecticut courts reviewing federal precedent concerning employment discrimination for guidance in enforcing the CFEPA. *Levy v. CHRO*, 236 Conn. 96, 103, 671 A.2d 349 (1996). With respect to disability discrimination claims under CFEPA, however, the CFEPA has a far broader definition of "disabled" than the ADA. *See Beason v. United Technologies Corp.*, 337 F.3d 271, 277 (2nd Cir. 2003). The statutory definition of a physically disabled person, for purposes of the CFEPA, is: "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." Conn.Gen.Stat. § 46a–51(15).2 [2]

### Claim For Discriminatory Animus Based On HIV Positive Status

■ The first query under the CFEPA is whether the plaintiff suffered from a chronic physical handicap, infirmity or impairment. The plaintiff claims that his HIV-positive status is sufficient under CFEPA to constitute a "chronic physical handicap, infirmity or impairment ..." section 46a–51(15). Defendant argues that, even under the broader protection of the CFEPA, plaintiff's HIV positive status does not constitute a "handicap" or "infirmity" or "impairment". In particular, defendant argues that, since the plaintiff was able to "take [his] medications such that [he] is not chronically handicapped, infirm, or impaired," he is therefore not disabled under the CFEPA. In support of this argument, Carlson puts forth testimony of plaintiff's treating physician, Dr. Diekhaus, that plaintiff is in the asymptomatic stage with only non-debilitating intermittent "mild fatigue" and "relatively minor issues, mainly dermatologic." Specifically, Dr. Diekhaus testified that from April 2000 to January 2001, Mr. Worster had been "referred to the Yale Aids program for participation in a clinical trial and was started on antiretroviral therapy, that he received reports from the trial group that Mr. Worster had responded well and was taking his medications that his laboratory tests looked very good." When Dr. Diekhaus saw plaintiff next in January, 2001, plaintiff "noted nearly complete resolution of his symptoms". Carlson asserts, therefore, that Mr. Worster was no longer disabled by fatigue by the time he began working at Chesters.

However, even were the Court to conclude, on the record before it, that plaintiff is protected under the CFEPA, he still must prove that Carlson's legitimate nondiscriminatory reason for the termination of his employment was pretextual. Defendant claims that plaintiff's employment was terminated because he misrepresented his need for medical leave by exaggerating

---

**2.** While the CFEPA definition of disability is broader than that of the ADA, the CFEPA provides no cause of action for perceived physical disability. *See Beason v. United Technologies Corp.*, 337 F.3d 271, 279–82 (2nd Cir.2003).

the extent of his HIV-related fatigue in order to obtain salary-and-benefit continuation which was available under Carlson's FMLA policy, but not under the personal leave policy. Carlson claims that Mr. Worster represented to it that he was unable to work due to extreme fatigue associated with his alleged disability. Carlson approved FMLA leave for Mr. Worster on the basis that he was too ill to work, only to learn that Mr. Worster was apparently well enough to relocate to Cape Cod for the summer and work in a restaurant there. Furthermore, Carlson complains that Mr. Worster sought to renew the leave even while he was well enough to work a restaurant job.

Additionally, Carlson justified its termination of the plaintiff's employment on the basis that Mr. Worster violated the Company's FMLA leave policy forbidding gainful employment during an employee's family and medical leave of absence when he took a job at a restaurant while on paid leave. Under the defendant's FMLA policy, taking on gainful employment during the leave was grounds alone for Mr. Worster's termination. Paragraph 17 of the FMLA Rights and Obligations, the provision which expressly prohibits "gainful employment during FMLOA", provides that, in the event of non-compliance, the company may seek "recovery of the company's share of health or dental insurance premiums [paid] during FMLOA." In light of this provision, the defendant points to plaintiff's proposed condition to settle his first CHRO claim-that the defendant waive its right to seek recovery of past wages and benefits paid.

Mr. Worster argues that Carlson's decision to terminate the plaintiff's employment relies on a policy that it previously chose not to enforce. The plaintiff's argument is that the fact that Carlson did not require him to give up a secondary job while he was on intermittent leave is sufficient to show that Carlson's legitimate reason for terminating his employment was pretextual. The Court is not persuaded. In its March 16, 2000 letter to the plaintiff, Carlson put the plaintiff on notice that "[w]hile we are not requesting at this time a relinquishment of the secondary job as a condition to retaining your leave rights, we will monitor your attendance and the impact on attendance caused by the secondary job." This letter was written with regard to the plaintiff's intermittent leave which commenced in 1999 and by its very terms is inapplicable to an FMLA leave of absence. In 2000, the plaintiff sought and was approved for an FMLA leave of absence. In order to obtain such leave, the plaintiff agreed that he would not engage in gainful employment. The plaintiff's employment was terminated only after the defendant learned and confirmed that the plaintiff had violated the Company's FMLA policy.

Plaintiff can point to nothing in the record that defendant's decision to terminate his employment after Carlson discovered his employment at Chester's in violation of paragraph 17 is pretextual. Carlson's generosity toward the plaintiff when he was on intermittent leave does not preclude it from enforcing its FMLA policy during a fully paid leave of absence. To the extent that the plaintiff argues that Carlson did not uniformly enforce its policy, the proper evidence to bring forth would be if Carlson knowingly allowed other employees to take a paid leave of absence while working a second job, not the Company's past generosity toward the plaintiff in a separate and distinct intermittent leave.

Because Mr. Worster fails to proffer credible evidence that Carlson's legitimate reason for terminating his employment was pretextual, summary judgment is

granted as to the CFEPA discriminatory discharge claim.

### The Lyme Disease Claims

Plaintiff further claims that he was discriminated against under the CFEPA when Carlson transferred him to the Pearson account in November 1999 and then again in January 2000 when Carlson refused to rescind the transfer. Underlying this claim, is plaintiff's contention that Lyme disease is a chronic physical impairment for purposes of bringing a CFEPA claim. As support for this contention, the plaintiff claims that he suffered from recurring headaches and fatigue that resulted in his need to take an intermittent leave of absence. Even if Lyme disease qualifies as a disability under the CFEPA, which is questionable, the Court cannot conclude that either the transfer or the refusal to rescind the transfer qualifies as an adverse action to meet the plaintiff's *prima facie* burden.

 Turning to Mr. Worster's allegation that his transfer was an adverse action, the Court doubts whether the transfer rises to the level of an adverse action. Transfers that do not result in a demotion through loss of pay, rank, title or significant job responsibilities do not ordinarily constitute adverse actions. *See Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 641 (2d Cir.2000) ("[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.") However, "an involuntary transfer may constitute an adverse employment action if the plaintiff show[s] that the transfer created a materially significant disadvantage with respect to the terms of [his] employment." *Williams v. R.H.*

*Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir.2004). Here, there is no evidence that assignment to the Pearson account materially disadvantaged the terms of Mr. Worster's employment. While the plaintiff charges that he was dissatisfied with the transfer and argues that the Pearson account position was less flexible and a lower level position, he does not claim that he suffered a loss of pay, rank or title. While his responsibilities changed from working one-on-one with a group to being one of a pool servicing a group, the transfer was a temporary one and plaintiff admitted at his deposition that it was for business reasons. Plaintiff admitted in his sworn testimony that the transfer occurred when "there was an increase in the corporate travel business and, as a result of that, it was necessary to pull [him] to the Pearson account, and subsequently Kim Mascone for the same reason was pulled to the Pearson account." "[I]t is not the function of a fact-finder to second-guess business decisions.... A business decision need not be good or even wise. It simply has to be nondiscriminatory.... Thus, the reasons tendered need not be well-advised, but merely truthful." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988). The Court further notes that the loan of both Mr. Worster and Ms. Mascone to the Pearson account was extended into January 2000.

 Similarly, Carlson's decision not to rescind Mr. Worster's transfer after the January meeting does not rise to the level of an adverse action. In any event, Ms. Garrett testified that the decision to keep Mr. Worster on the Pearson account was an accommodation to his request for intermittent leave.[3] Specifically, Ms. Garrett

---

**3.** While the plaintiff asserts that a transfer to an alternative position is not proper under the FMLA, the plaintiff's transfer occurred prior to the plaintiff's request for FMLA intermittent leave. The plaintiff has presented no evidence that the defendant was obligated un-

testified that the Pearson account afforded more flexibility to accommodate the plaintiff's intermittent leave request. It is credible that, for business planning purposes, Carlson would prefer to have Mr. Worster performing duties in a position where it would have backup to the extent the Mr. Worster was using intermittent leave. Indeed, it is well established that "Employers need a certain amount of flexibility to organize their companies efficiently, and courts should hesitate before second-guessing their day-to-day personnel decisions." *Bruno v. Sonalysts, Inc.*, 2004 WL 2713239, *5 (D.Conn.) (citations omitted).

The Court concludes that neither the transfer to the Pearson account nor Carlson's refusal to rescind the transfer in early 2000 are adverse events, and that, even if they were, the plaintiff has failed to proffer evidence that Carlson's legitimate reasons to transfer him to the Pearson account or the decision not to rescind the transfer were pretextual. Accordingly, Count II is dismissed in its entirety.

**COUNTS THREE AND FOUR** *The Retaliation Claims*

■ In order to survive summary judgment on his retaliation claims under the CFEPA and the ADA, Mr. Worster must make a *prima facie* case of retaliation by showing: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and adverse employment action." *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir.2004) (*quoting Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995)). Retaliation claims are analyzed in the same manner under the CFEPA. *See Brittell v. Dep't of Correction*, 247 Conn. 148, 163–64, 717

A.2d 1254 (1998) (state anti-discrimination statute is coextensive with the federal statute).

■ Analogously, to survive summary judgment on his FMLA retaliation claim, Mr. Worster must show that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. New York*, 365 F.3d 165, 168 (2d Cir.2004).

The *McDonnell Douglas* burden shifting analysis applies to claims of retaliation under the FMLA, the ADA and the CFEPA. *See Treglia v. Town of Manlius*, 313 F.3d 713 (2d Cir.2002) (applying *McDonnell Douglas* to ADA retaliation claim); *Potenza*, 365 F.3d at 168 (applying *McDonnell Douglas* to FMLA retaliation claims). Thus, under the ADA, CFEPA or the FMLA, once Mr. Worster has made a *prima facie* case, the burden shifts to Carlson to provide a legitimate non-discriminatory reason for its action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If Carlson provides such a reason, the burden shifts back to Mr. Worster to provide evidence from which a jury could conclude that Carlson's articulated reasons for its actions are false and that the real reason for its actions was retaliation as alleged. *Id.* at 803, 93 S.Ct. 1817.

*ADA and CFEPA Retaliation Claims*

■ The Court concludes that the ADA and CFEPA retaliation claims fail as a matter of law as there are no adverse actions other than the termination of the plaintiff's employment, and, in any event,

der the FMLA to return the plaintiff to his former position once he requested intermit-

tent leave. Nor would the Court so conclude on the record before it.

the plaintiff fails to proffer any evidence that the termination was caused by his protected activity or occurred under circumstances giving rise to an inference of discriminatory intent. Mr. Worster asserts that Carlson's decision to discipline, demote and terminate the plaintiff's employment were in violation of the anti-retaliation provisions of the ADA and CFEPA. Specifically, Mr. Worster claims that Carlson retaliated against him by: (1) transferring him to the Pearson account; (2) refusing to rescind the transfer after he was placed on intermittent leave; and (3) terminating his employment.

First, neither the transfer to the Pearson account nor Carlson's decision not to rescind the transfer constitute adverse employment events. Furthermore, the transfer to the Pearson account and Carlson's January 2000 [4] refusal to return the plaintiff to his previous position occurred prior to the filing of the CHRO claim and were in fact the basis of the CHRO claim.

Plaintiff alleges that it is enough that the defendant's refusal to end his transfer followed the January meeting and the filing of CHRO complaint closely in time. The undisputed facts show that plaintiff met with his supervisor and HR personnel in late January at which time he complained about his transfer to the Pearson account and requested to be returned to his former position. At this time, Carlson denied his request. Shortly thereafter, plaintiff filed a claim with the CHRO. In a letter dated March 16, 2000, defendant expressly stated to the plaintiff that it would not return him to his former position until he provided documentation from his physician showing that he no longer required intermittent leave. The Court cannot state that refusing the plaintiff's request to return to the Meeting Department amounts to retaliation. The plaintiff

had made a request, and the employer was obligated to respond in a timely manner. In any event, Mr. Worster cannot rebut Carlson's legitimate reason for denying the request. Carlson had already granted the plaintiff intermittent leave. In so doing, Carlson stated that, for planning purposes, Mr. Worster's placement in the Pearson account provided the kind of flexibility that accommodated the request for intermittent leave, not available in his prior position. The Company's decision was consistent with this position.

Next, the Court considers whether the termination of employment constitutes retaliation for Mr. Worster's protected activity. While a termination is undisputedly an adverse action, Mr. Worster must nevertheless establish that the termination is causally connected to his protected activity. *See Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). The plaintiff alleges that the fact that defendant had been contacted to discuss settlement of the CHRO claim the day before the termination of his employment is a sufficient nexus to the termination to establish retaliation. The mere fact that defendant had engaged in settlement discussions the day before the termination is not sufficient to show a causal connection. Furthermore, even if plaintiff can establish a causal connection, Defendant has proffered legitimate business reasons for each of the alleged adverse actions: (1) as to the refusal to rescind transfer, defendant offered that this position allowed it to accommodate plaintiff's FMLA intermediate leave request; and (2) as to termination, defendant was enforcing its own FMLA policy which prohibited covered employees from working second jobs while on covered leave. Plaintiff has not provided any evidence from which a

---

4. The defendant reiterated its denial of this request in March of 2000.

jury could conclude that Carlson's articulated reasons for terminating his employment are false.

Accordingly, the Court grants summary judgment as to Count III.

### FMLA Retaliation Claim

■ Mr. Worster claims that Carlson interfered with his rights under the FMLA and retaliated against him for taking FMLA leave. The FMLA, 29 U.S.C. § 2601, et seq., entitles eligible employees to certain leave benefits. Section 2612 provides that an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12–month period, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also prohibits employers from retaliating or discriminating against employees who have exercised rights protected under the FMLA. 29 U.S.C. § 2615(a). "An employer is prohibited from discriminating against employees ... who have used FMLA leave." *Bond v. Sterling*, 77 F.Supp.2d 300, 302 (N.D.N.Y.1999) (quoting *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999) (quoting 29 C.F.R. § 825.220(c))). "Nor may employers use the taking of FMLA leave as a negative factor in employment decisions, such as hiring, promotions or disciplinary actions." *Id.* (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998)) (quoting 29 C.F.R. § 825.220(c)). As discussed above, claims of retaliation are analyzed according to the *McDonnell Douglas* burden-shifting framework. *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir.2004).

The parties do not dispute that Mr. Worster availed himself of the protected rights under the FMLA in two separate leaves, an intermittent leave granted in December of 1999 based on symptoms his doctor believed to be associated with Lyme disease and a leave of absence in the summer of 2000 based on his condition as a result of his HIV positive status. Plaintiff first complains that, as a result of his taking intermittent leave in December 1999, Carlson retaliated against him by forcing him to remain servicing the Pearson account. Plaintiff next complains that his termination was in retaliation for taking FMLA leave in the summer of 2000.

There is no dispute that Mr. Worster was qualified for the position. The remaining issue with the Court with respect to the FMLA claims is whether Carlson took an adverse employment action against him that was causally connected to his FMLA request. As discussed above, the transfer which occurred prior to the request for leave is not a sufficient basis for an FMLA retaliation claim. The next question is whether Carlson's refusal to rescind Worster's transfer to the Pearson account was a retaliatory act. In support of his claim, Mr. Worster points to his supervisor's statement at the January 2000 meeting that he could not count on the plaintiff as a result of his medical condition and the fact that he was on leave and that Carlson informed Mr. Worster that he would not return to the Meetings Department while on intermittent leave. Carlson readily concedes that Fischer made a connection with his unwillingness to have the plaintiff return to the Meeting Department and the plaintiff's absences and use of FMLA leave. Defendant's Human Resource Director Joan Garrett informed the plaintiff that the Company decided to keep Mr. Worster on the Pearson account because it "provided more flexibility on that account for—where attendance, day-to-day attendance was not as critical, versus in the group-and-meeting department." Plaintiff argues that the fact that "regular attendance" was also "an essential func-

tion" of the Pearson account is sufficient to render the Company's decision pretextual. The Court does not agree; the fact that regular attendance is required does not mean that attendance may be less critical in a job where the plaintiff is one of several servicing a group versus just one servicing a group.

Plaintiff next alleges that Carlson terminated his employment in retaliation for taking FMLA leave in the summer of 2000. The termination of Mr. Worster's employment occurred over two months after his request for FMLA. The real dispute here centers on the question of whether Carlson had a legitimate non-discriminatory business reason for terminating Mr. Worster when it did. Carlson contends that this claim must fail because a reasonable jury could not conclude that Worster's leave played a part in Carlson's decision to terminate his employment. Rather, Carlson explains that it terminated Worster's employment because it believed that Mr. Worster had committed a fraud in obtaining paid leave and violated the company's FMLOA policy by obtaining employment in Cape Cod. Viewing the facts in the light most favorable to Mr. Worster, the Court cannot conclude that the termination occurred under circumstances from which one can infer discrimination. Specifically, as discussed at length above, Mr. Worster has proffered no credible evidence that Carlson's reason for terminating his employment is pretextual.

Accordingly, summary judgment is granted as to the plaintiff's FMLA claim.

## COUNT FIVE *Negligent Infliction of Emotional Distress*

 Finally, Carlson moves for summary judgment on Worster's claim of negligent infliction of emotional distress ("NIED"). Worster alleges that he suffered emotional distress, anxiety, embarrassment and mental anguish as a result of his termination.

 In the employment context, NIED arises only where it is based upon the defendant's unreasonable conduct in the termination process. *See Parsons v. United Techs. Corp.*, 243 Conn. 66, 89, 700 A.2d 655 (1997). The dispositive issue is whether the employer's conduct "was sufficiently wrongful that [it] should have realized that its conduct involved an unreasonable risk of causing emotional distress," which could result in illness or bodily harm. *Perodeau v. City of Hartford*, 259 Conn. 729, 751, 792 A.2d 752 (2002) (internal quotes and citation omitted). However, the mere termination of employment, even where it is wrongful, is not by itself sufficient to sustain a claim for negligent infliction of emotional distress. *See Parsons*, 243 Conn. at 88–89, 700 A.2d 655. In other words, firing an employee does not transgress the bounds of socially tolerable behavior.

 Here, Worster claims that there is evidence that would permit a jury to find that the Defendant's conduct created an unreasonable risk of emotional harm: 1) if the defendant's conduct was due to unlawful animus based on the Plaintiff's FMLA leave or disability, or in retaliation for his complaints of discrimination, such action would be unreasonable; 2) the manner in which Carlson carried out the termination, including its telephone call to Chester's to confirm his employment there and the fact that the termination letter was sent to plaintiff at Chester's address; 3) Carlson's decision to terminate Worster, thereby cutting off his access to health insurance benefits.

Even when taken in the light most favorable to him, the facts that Worster puts forth would not allow a reasonable jury to infer that Carlson acted egregiously. First, as stated above, plaintiff has offered no evidence of unlawful animus based on

the plaintiff's FMLA leave or alleged disability, or in retaliation for his complaints of discrimination. Second, the manner in which Carlson terminated the plaintiff's employment, i.e., Carlson's telephone calls to Chester's to verify the plaintiff's employment and the sending of the termination letter to the plaintiff at his employer's address, does not rise to the level required to state a claim for emotional distress. Third, inasmuch as Mr. Worster claims that the cutting off of benefits is actionable as NIED, the cutting off of benefits is no different than the mere termination itself, which alone is not enough to state a claim for NIED. In any event, none of these incidents that Worster points to is extreme or outrageous. *See, e.g., Miner v. Town of Cheshire*, 126 F.Supp.2d 184, 197 (D.Conn.2000) (reasoning that because emotional distress in the workplace is not uncommon, courts do not lightly intervene to impair the exercise of management discretion and have thus attempted to keep a tight rein on the expansion of NIED claims in the employment context, limiting them to instances of unreasonable conduct) (citing cases). Accordingly, summary judgment is granted in favor of Carlson on this claim as well.

### Conclusion

Plaintiff has failed to set forth any genuine issues of material fact upon which he would bear the burden at trial. As a result, the Defendant's Motion for Summary Judgment [Doc. No. 18] is hereby GRANTED.

IT IS SO ORDERED.